RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2000 FED App. 0286P (6th Cir.)
File Name:  00a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BP CHEMICALS, INC.,
        _Plaintiff-Appellant/_
        _Cross-Appellee,_

                                        Nos. 99-3429/3485

_v._

FIRST STATE INSURANCE
COMPANY,
        _Defendant-Appellee/_
        _Cross-Appellant._

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 96-00046—Donald C. Nugent, District Judge.

Argued:  April 27, 2000

Decided and Filed:  August 29, 2000

Before:  GUY, BOGGS, and SUHRHEINRICH, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:**  Thomas S. Kilbane, SQUIRE, SANDERS &
DEMPSEY, Cleveland, Ohio, for Appellant.  Bruce M.
Allman, THOMPSON, HINE & FLORY, Cincinnati, Ohio,

for Appellee.  **ON BRIEF:**  Thomas S. Kilbane, Steven A. Friedman, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellant.  Bruce M. Allman, Laurie J. Nicholson, THOMPSON, HINE & FLORY, Cincinnati, Ohio, Timothy J. Coughlin, THOMPSON, HINE & FLORY, Cleveland, Ohio, for Appellee.

———————————

## OPINION

———————————

RALPH B. GUY, JR., Circuit Judge.  Plaintiff, BP Chemicals, Inc., appeals from the entry of judgment in favor of defendant, First State Insurance Company, in this breach of contract action for indemnification under an excess liability insurance policy purchased by its contractor, Bath Electrical Systems, Inc.  BP sought to recover more than $2,000,000 it paid in settlement of an underlying negligence action seeking damages for the electrocution death of a Bath employee performing work at a BP plant.

BP argues that the district court properly found it was an insured under First State's excess policy, but erred (1) by failing to determine whether the policy covered BP for its own negligence, and (2) by finding the cross-liability exclusion in the excess policy barred any coverage.  Arguing that the district court properly found the exclusion barred coverage, First State also urges in its cross-appeal that we affirm on the alternative grounds that either BP was not an insured, or the policy did not cover BP's own negligence.  After careful review of the arguments presented and the applicable law, we affirm.

### I.

In 1993, BP Chemical and Bath Electrical contracted for Bath to provide cleaning and maintenance services for the electrical systems at a BP plant in Port Lavaca, Texas.  The scope-of-work provisions in the BP-Bath contract required BP

to provide appropriate diagrams of the electrical power distribution and to perform all switching necessary to de-energize and isolate plant electrical equipment. Bath employees, including Bryan Swift, were instructed to not work on circuits that had not been verified as de-energized. After the plant was partially shut down, several BP employees and Swift de-energized, tagged, and locked out certain transformer equipment.

On September 21, 1993, Swift, a Bath supervisor, was troubleshooting a problem with an electrical circuit. Swift had "Butch" Amaimo, a BP employee, unlock one de-energized cubicle. Finding no problem, Swift opened an adjacent compartment that was not locked out, tagged, or de-energized. There was evidence that Amaimo told Swift only that it was an "incoming" panel and then left him alone, despite knowing from past experience that oral warnings can be insufficient. Also, BP did not provide the detailed drawings it had of the compartment's interior to Swift or any other Bath employee. Swift was electrocuted when he made contact with the energized cables.

A wrongful death action was filed in the Texas state courts alleging that Swift's death was caused by both BP's negligence and Bath's gross negligence. The claim against BP was settled during trial for $3,000,000 plus a $50,000 *ad litem* fee. First State does not contest the reasonableness of the settlement. After the settlement, the claim against Bath was dismissed by the state court.

Although the negligence issue was not decided in the state court proceeding, the district court determined that the insurance question in this case depended upon the relative negligence of BP, Bath, and Swift. The issue was tried to a jury and the jury returned a special verdict finding BP's negligence was a proximate cause of the injuries suffered by Swift, but Bath was not negligent. The jury specifically found that BP was 75% negligent, Swift was 25% negligent, and Bath was 0% negligent. Significantly, BP does not appeal the

jury's verdict or the denial of its post-trial motion for judgment as a matter of law, or for a new trial.

The BP-Bath contract required that Bath obtain and maintain the insurance policies, including any special coverage provisions, specified in Exhibit A. Exhibit A, a form prepared by BP, required that Bath have at least $1,000,000 in comprehensive general liability insurance and obtain an Additional Insured endorsement.[1] Bath had previously purchased a $1,000,000 general liability policy from National Union Fire Insurance Company covering the period from November 1, 1992, to November 1, 1993. Bath also obtained an insurance policy from First State covering the same period, which provided $5,000,000 in excess liability and umbrella coverage. The excess coverage was neither mentioned in nor required by the BP-Bath contract. BP first learned of the excess policy during discovery in the state court action. Exhibit A of the BP-Bath contract listed the National Union policy and, on the same page, both Bath and an agent for National Union certified that the general liability policy had limits of at least the amount specified and contained the listed endorsements (Certificate of Insurance).

BP's preprinted contract contained an indemnification clause in paragraph 11(a), which purported to hold BP harmless from all liabilities and claims for loss or injury to person or property in "any manner arising out of or in connection with the WORK." The indemnification provision also stated that the indemnity obligation would not apply to the extent that BP was provided coverage as an additional

---

[1]Also required were workers' compensation insurance and automobile liability insurance. These policies are not at issue.

**AFFIRMED.**

---

evidence of the parties' intent or understanding is not admissible to create an ambiguity. *See Balandran*, 972 S.W.2d at 741.

illusory because Bath would be covered for liability to a third party if the injury was caused by an Insured, whether it is a Named or an Additional Insured. For example, coverage would not be excluded if a Bath employee's negligence caused injury to someone not employed by either Bath or BP.

BP also argues that the cross-liability exclusion was intended only to extend another exclusion (in the umbrella insurance provisions) to apply between all Named Insureds. Specifically, the umbrella provisions exclude coverage for bodily injury to an "employee of the Insured arising out of and in the course of employment by the Insured," except for "liability assumed by **you** under any contract." The term Insured, however, is separately defined for purposes of the policy's umbrella coverage and is different from the definition of the term Insured for purposes of excess insurance coverage.

BP also argues that ambiguity arises from the use of the phrase "employee of an Insured" because it could be interpreted to mean that only the liability of an individual employee is excluded, while coverage would remain for corporate liability. To the contrary, the exclusion applies to "any liability" for injuries "*caused by*" an employee of one Insured to an employee of another Insured. BP, the corporate entity, did not "cause" the injuries to Swift. Rather, it was the negligence of BP's employees and of Swift himself that caused his electrocution.

We find that the plain and unambiguous language of the cross-liability exclusion specifically excluded liability for bodily injury caused by employees of one Insured, BP, to an employee of another Insured, Bath. BP sought coverage as an Insured under the excess policy and, likewise, is an Insured for purposes of the cross-liability exclusion.[8]

---

[8]Unable to establish ambiguity in the language itself, BP asserts that ambiguity is evident from First State's failure to mention the cross-liability exclusion among the litany of defenses asserted until after BP's claim was forwarded to First State's parent company. However, parol

insured as specified in Exhibit A.[2] Bath took exception to this indemnification clause and proposed another in lieu of the standard provision. After BP proposed further changes, the negotiated indemnification agreement became part of the contract. In that provision, Bath agreed to indemnify BP against "any and all losses, expenses, demands and claims" that may be claimed or for which suit is brought for any actual or alleged bodily injury or death occurring to any person whatsoever, "arising out of, in connection with, or resulting in whole or in part out of the acts or omissions of BES, INC., or any subcontractors employed by or under the direct control of BES, INC. and their respective officers, agents and employees in the performance of the work in accordance with this Agreement [BP-Bath contract]." The indemnity obligation was limited, however, as follows:

> Such obligation *shall not apply* when the liability arises solely from the negligence of Owner, its employees or agents. Such obligation *shall also be limited*, in a case involving or alleging joint negligence between BES, INC., and Owner, its employees or agents, to BES, INC.'s actual percentage of comparative negligence, if

---

[2]The standard indemnification clause proposed by BP stated in pertinent part as follows:

> INDEMNIFICATION: (a) In General – CONTRACTOR hereby indemnifies and agrees to defend and save OWNER and its affiliated Corporations, their agents, servants and employees harmless from all liabilities and claims for loss, damage or injury to or death of persons and loss of or damage to property, including property of OWNER, in any manner arising out of or in connection with the WORK, and agrees to pay all damages, costs and expenses, including attorneys' fees, arising in connection therewith. This indemnity obligation of CONTRACTOR shall not be applicable to the extent that OWNER is provided coverage as an additional insured under CONTRACTOR'S insurance policies as specified in Exhibit "A" to this CONTRACT, or to the extent that the right of indemnity is prohibited or limited by the laws of the state in which the WORK is located.

any, found by the trier of fact in a cause of action brought against BES, INC. arising out of the performance of the work or alleged negligence in accordance with this Agreement.

(Emphasis added.)

At BP's request, the primary liability insurer, National Union, provided a defense in the underlying lawsuit based upon BP's status as an additional insured under its policy. Despite National Union's determination that it should assume the defense and indemnify BP, First State denied there was coverage under the excess policy for a litany of reasons. The underlying action was settled with the advice of National Union's representatives, and National Union tendered the limits of the primary policy. When First State refused to tender the additional $2,050,000 due under the settlement, BP paid it from its own funds and brought this action.[3]

In the course of considering the parties' several motions for summary judgment, the district court concluded that since BP was an additional insured under National Union's primary policy, BP also was an insured under First State's excess policy. Without deciding whether the underlying policy covered BP for its own negligence, the district court found that any excess liability coverage for BP's own negligence would be excluded by the separate cross-liability exclusion found only in the excess policy.[4] After the jury determined

---

[3]We note that First State has strenuously argued, and we agree, that it is not bound by National Union's decision to defend the underlying suit and tender payment on the settlement. *See Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 603 (Tex. 1988) (coverage not created by waiver or estoppel). Further, National Union's decision would have been informed by a variety of factors apart from the policy language, including uncertainty about the relative fault of BP and Bath.

[4]BP makes much of the fact that the district court requested additional briefing on the coverage question and then decided the case on the basis of the cross-liability exclusion. While BP implies some surprise,

(Emphasis added.) As the district court observed, the excess policy specifically defines the term "Insured" as follows:

IN THIS POLICY THE WORDS **YOU** AND **YOUR** REFER TO THE NAMED INSURED SHOWN IN THE DECLARATIONS. THE WORD **INSURED** MEANS ANY PERSON OR ORGANIZATION QUALIFYING AS SUCH UNDER SECTION IV – NAMED INSURED AND INSURED.

Section IV, "NAMED INSURED AND INSURED," provides in part:

**WHO IS AN INSURED – COVERAGE A (EXCESS LIABILITY INSURANCE)**

Except as provided in WHO IS AN INSURED – NEWLY ACQUIRED OR FORMED ENTITIES[,] each person or organization who is an **Insured** in the **underlying insurance** is an **Insured** under Coverage A subject to all the limitations upon such **underlying insurance** other than the limits of the underlying insurer's liability.

The plain meaning of these terms is that "you" or "your" is limited to the Named Insured, but that the term "insured" includes both named and additional insureds in the underlying insurance. Thus, the exclusion for any liability for injuries "caused by an employee of one Insured to an employee of another Insured" applies here, since it has been determined that the negligence of BP's employees "caused" the death of Bath's employee.

BP contends that the cross-liability exclusion is ambiguous and should be read to apply only between Named Insureds because, otherwise, the excess coverage would be illusory. BP explains that unless the term Insured refers only to Named Insureds, Bath would have no excess liability coverage if it had been a Bath employee that caused injury to a BP employee. First State responds that the excess coverage is not

*Getty Oil,* that the insurance obligation was an independent, free-standing obligation. We find that the most reasonable construction of the additional insured endorsements in this case is that they were intended to assure performance of the indemnity agreement and, therefore, must be read in conjunction with the indemnity provisions, which certainly do not explicitly express any intention to indemnify BP for its own negligence.[7]

## C.   Cross-Liability Exclusion

Having determined that the primary policy did not cover BP for its own negligence, we nonetheless also conclude that the district court did not err in finding that the excess liability insurance excluded coverage for Swift's electrocution. The excess insurance followed the primary liability insurance, "except as otherwise stated in this policy." The excess policy included the following cross-liability exclusion:

> This policy shall not apply to any liability of one Insured for property damage to the property of another Insured, or to *any liability for bodily injury or personal injury caused by an employee of one Insured to an employee of another Insured.*

---

[7]First State relies upon evidence that the individuals involved in making the contracts actually understood that the Exhibit A endorsement would protect BP from exposure to Bath's liability, but not for BP's own independent liability. Such evidence may not be considered in determining whether a contract is ambiguous. Yet, if we were to find the Exhibit A endorsement ambiguous, First State is correct that it would have to be construed against BP. *See Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 115 (Tex. 1978). Although the Texas courts have repeatedly stated the rule that an ambiguous provision must be construed in favor of the insured, the Texas Supreme Court recently took care to note that this "widely followed rule is an outgrowth of the general principle that uncertain contractual language is construed against the party selecting the language. *See* Segalla, 2 Couch on Insurance § 22.14 (3d ed. 1997)." *Balandran,* 972 S.W.2d at 741 n.1.

that BP was negligent and Bath was not, the district court entered judgment in favor of First State. BP appealed and First State cross-appealed.

## II.

We review the district court's interpretation of an insurance contract *de novo. See Parameter Driven Software, Inc. v. Massachusetts Bay Ins. Co.,* 25 F.3d 332, 336 (6th Cir. 1994). We also review the grant of summary judgment *de novo. See, e.g., Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir. 1997). Although the district court denied First State's motion for summary judgment and BP's cross-motion for summary judgment, the court interpreted the insurance policies and determined the scope of coverage. The only issue tried to the jury was the allocation of fault in Swift's death. The entry of judgment in this case was based upon a determination that First State was entitled to judgment as a matter of law and was essentially a grant of summary judgment. On appeal, the parties contest the district court's conclusions of law and do not suggest that questions of fact remained for trial.

The parties agree that Texas law governs this action. Under Texas law insurance policies are construed under the rules of contract construction. *See Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738 (Tex. 1998); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex. 1987). When interpreting a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *See Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex. 1994). The court must read all parts of the contract together to ascertain the agreement of the parties, and each part of the contract should be given effect. *See id.* If a contract is expressed in plain and unambiguous language, the court may not resort to the rules of construction. *See Barnett,* 723 S.W.2d at 665. An

---

the cross-liability exclusion had been raised. As such, the chronology of the various motions and the district court's three orders addressing the motions for summary judgment are not significant to our review.

insurance provision is ambiguous when it is susceptible to more than one fair and reasonable interpretation. *See Ohio Cas. Group of Ins. Cos., v. Chavez,* 942 S.W.2d 654, 658 (Tex. App. 1997). Courts should not, however, strain to find an ambiguity if doing so defeats the probable intention of the parties. *See id.* Both the determination of whether an insurance provision is ambiguous and the interpretation of unambiguous language are questions of law. *See id.* at 657.

First State's policy provided two kinds of coverage: excess liability insurance (following form) and umbrella liability insurance (over a self-insured retention). Only the former is at issue here. The excess coverage "follows the underlying insurance except as otherwise stated in [the First State] policy." Although First State argues that BP was not an insured under the excess coverage, we find BP was an insured as that term is defined in First State's policy. The next question, whether BP was covered for its own negligence, must be determined from the scope of coverage provided by the underlying insurance policy. Finally, BP urges that we reverse the district court's finding that the excess policy itself, through the cross-liability exclusion, excluded coverage for BP. For the reasons set forth below, our *de novo* review leads us to find both (1) that the underlying policy did not cover BP for its own negligence, and (2) that the excess policy independently excluded coverage in this case.

**A. Insured**

First State argues initially that BP cannot be an insured under the excess policy because the BP-Bath contract did not require that Bath either have excess liability insurance, or obtain an additional insured endorsement to an excess policy. This contention is without merit. First State's excess policy defines "Insured" such that "each person or organization who is an Insured in the underlying insurance is an Insured under Coverage A [excess coverage] subject to all the limitations upon such underlying insurance other than the limits of the underlying insurer's liability." Thus, if BP was an insured

1992), declined to extend the express negligence doctrine to separate insurance agreements that were not intended to support an indemnity agreement. In *Getty Oil,* the court first found that an indemnity provision holding Getty harmless for its own negligence was invalid under a Texas statute. The court then, however, rejected the claim that an independent additional insured provision was also invalid to the extent that it required coverage for Getty's own negligence. Thus, an insurance agreement that stands alone can validly shift the risk of insuring a party's own negligence to another without specifically expressing the intention to do so. *See, e.g., Certain Underwriters at Lloyd's London v. Oryx Energy Co.,* 142 F.3d 255 (5th Cir. 1998).

These principles were applied in *Emery Air Freight Corp. v. General Transport Systems, Inc.,* 933 S.W.2d 312, 314 (Tex. App. 1996), to the question of whether a contract required one to be *insured* against liability arising from its own negligence. The court distinguished the independent additional insured provision in *Getty Oil*, which "required the extension of coverage 'whether or not required [by the other provisions of the contract].'" *Id.* (alteration in original) (quoting *Getty Oil*, 845 S.W.2d at 804). The *Emery* court explained that: "Based on this factual distinction from the *Fireman's Fund* contract, the [*Getty Oil*] court held the additional insured provision did not support the indemnity provision, but was instead a free-standing obligation." *Id.* The court in *Emery* concluded that the contract did not require the indemnitee be insured against its own negligence, finding that the "most reasonable construction" of the insurance provisions in the contract was that they were intended to assure performance of the indemnity agreement and did not create an independent obligation.

In this case, neither the indemnity agreement nor the additional insured endorsements expressly state an intention to indemnify BP against its own negligence. The insurance provisions of the contract, including the Exhibit A endorsement, do not include language demonstrating, as in

under the primary policy, it was also an insured under the excess policy.[5]

The underlying policy included a blanket endorsement (CG-4) for additional insureds which stated in its entirety:

IT IS AGREED THAT ADDITIONAL INSUREDS ARE COVERED UNDER THIS POLICY AS REQUIRED BY *WRITTEN CONTRACT*, BUT ONLY WITH RESPECT TO LIABILITIES ARISING OUT OF THEIR OPERATIONS PERFORMED BY OR FOR THE NAMED INSURED, BUT EXCLUDING ANY NEGLIGENT ACTS COMMITTED BY SUCH ADDITIONAL INSURED.

BP qualified as an additional insured under this blanket endorsement because the BP-Bath contract expressly required that BP be endorsed as an additional insured under the primary policy. BP is also an additional insured by reason of the Certificate of Insurance, which certified that Bath had obtained the following relevant endorsement to the primary policy:

(1) OWNER [BP] is an additional insured thereunder as respects liability arising out of or from the WORK performed by CONTRACTOR [Bath] for OWNER [BP][.]

The Certificate of Insurance, executed after the policy had been issued, was signed by authorized representatives of National Union and Bath. Since BP was an insured under the primary policy, it also was an insured under the excess policy.

---

[5]This is unlike the policies at issue in *Musgrove v. Southland Corp.,* 898 F.2d 1041 (5th Cir. 1990), and *Forest Oil Corp. v. Strata Energy, Inc.,* 929 F.2d 1039, 1041 (5th Cir. 1991), in which the excess insurance policies themselves expressly defined insured to mean one to whom the named insured was obligated by written contract to provide excess insurance.

This result is further compelled when the contract is read in light of the surrounding circumstances. *See Balandran*, 972 S.W.2d at 741. In this case, Exhibit A is part of both the insurance policy and the BP-Bath contract. The insurance coverage and endorsements in Exhibit A were required by the BP-Bath contract, and the indemnification provision originally proposed by BP specifically referenced those insurance provisions. Unwilling to accept the obligation to indemnify BP for all liabilities arising out of or in connection with the work, Bath proposed and the parties negotiated a more limited indemnification agreement. While the scope of the indemnification agreement is not before the court, its provisions clearly reflect an intention to limit Bath's obligation to indemnify BP for BP's own negligence.

Texas law has recognized a relationship between indemnity and insurance obligations in the context of determining whether parties to a contract intended to indemnify an indemnitee for its own negligence. *See Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* 490 S.W.2d 818 (Tex. 1972). Since *Fireman's Fund,* the Texas Supreme Court has adopted a brighter-line express negligence doctrine requiring that parties seeking to indemnify an indemnitee for the consequences of its own negligence specifically state that intention within the four corners of the contract. *See Ethyl Corp. v. Daniel Constr. Co.,* 725 S.W.2d 705, 708 (Tex. 1987). The Texas Supreme Court in *Getty Oil Co. v. Insurance Co. of North America,* 845 S.W.2d 794 (Tex.

---

insured's negligence and would not extend to the additional insured's own negligence. *See also Mid-Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487 (5th Cir. 2000); *Mid-Continent Cas. Co. v. Chevron Pipe Line Co.,* 205 F.3d 222 (5th Cir. 2000). Without agreeing or disagreeing with the decisions in these cases, we find that they are inapplicable here. Whether or not the scope of the additional insured coverage defined by the "arising out of" language in the endorsements could be interpreted as BP urges, the primary policy also contained the specific exclusion for any negligent acts committed by the additional insured. *See Chevron*, 205 F.3d at 229 (noting insurer could easily have limited coverage by including terms of further limitation).

## B.   Scope of Coverage for Additional Insureds

The district court did not resolve the question of whether the primary liability policy covered BP, as an additional insured, for its own negligence.  BP argues that the district court erred by failing to grant summary judgment in its favor on this question because no genuine  issue of material fact existed.  While we agree that the matter can be determined as a matter of law, we find that, when all of the provisions are read together, it is clear that the parties intended that BP would not be covered as an additional insured for its own negligence.

BP maintains that the Certificate of Insurance, which incorporates the Exhibit A endorsement, "trumps" the CG-4 endorsement and by its terms unambiguously provides coverage without regard for BP's own negligence.  This reasoning rests on two conclusions: first, that the endorsements in CG-4 and Exhibit A conflict; and second, that the Exhibit A endorsement provides coverage without regard for the additional insured's own negligence.  BP relies upon several cases for the general proposition that when a certificate of insurance conflicts with the main policy, the certificate controls.  *See, e.g., City of Northglenn v. Chevron USA, Inc.,* 634 F. Supp. 217, 225 (D. Colo. 1986); *J.M. Corbett Co. v. Insurance Co. of N. Am.*, 357 N.E.2d 125 (Ill. App. Ct. 1976).  A Texas court recently explained that while endorsements  generally  supersede  and  control  over conflicting provisions of a policy, "added provisions will only supersede  the  previous  policy  terms  to  the  extent  they  are truly  in  conflict.   The  policy  and  endorsement  should  be construed together unless they are so much in conflict that they cannot be reconciled."  *See Mesa Operating Co. v. California Union Ins. Co.,* 986 S.W.2d 749, 754 (Tex. App. 1999) (citation omitted).   When  the  additional  insured endorsements in this case are construed together, they are not inconsistent.

The policy's CG-4 endorsement defines the scope of BP's additional insured coverage  with respect to this case in two relevant ways: (1) by providing coverage only with respect to liability arising out of BP's operations performed by Bath; and (2) by expressly excluding any negligent acts committed by  the  additional  insured.   The  Exhibit  A  endorsement, certified to be part of the primary liability policy, only defines the scope of coverage in terms of liability arising out of or from the work performed by Bath for BP.  There is no claim of a conflict between the meaning of the "arising out of" language in these endorsements.

Rather, BP seems to argue that because this and similar "arising out of" language has been interpreted by some courts to  afford  coverage  without  requiring  that  the  liability  be "caused by" the named insured (in this case Bath), the Exhibit A  endorsement  somehow  conflicts  and  controls  the  more specific exclusion in the CG-4 endorsement. To the contrary, we need not decide whether the "arising out of" language encompasses an additional insured's own negligence because, unlike other cases construing such language, the policy here contains a specific exclusion from coverage for an additional insured for any negligent acts committed by the additional insured.  Each part of the contract should be given effect and more  specific  provisions  control  over  general  ones.   "For example,  when  a  contract  provision  makes  a  general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision  will  control.   *See* 3 ARTHUR L. CORBIN, CONTRACTS § 545-54 (1960)." *Forbau,* 876 S.W.2d at 134.[6]

---

[6] BP relies heavily upon two recent Texas Court of Appeals decisions interpreting the additional insured provisions that cover liability "arising out of" either the named insured's operations, or the named insured's work for the additional insured.  *See McCarthy Bros. Co. v. Continental Lloyds Ins. Co.,* 7 S.W.3d 725, 767 (Tex. App. 1999); *Admiral Ins. Co. v. Trident NGL, Inc.,* 988 S.W.2d 451, 454 (Tex. App. 1999).  In *McCarthy,* the court rejected the interpretation that "arising out of" meant "directly  from"  such  that  liability  must  stem  directly  from  the  named