**CERTAIN LONDON MARKET INSURANCE COMPANIES, Allianz Insurance Company, Zurich American Insurance Company, Plaintiffs,**

v.

**PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, Defendant.**

No. 1:01 CV 179–D–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

June 20, 2003.

Scott William Bates, Baker, Donelson, Bearman & Caldwell, Jackson, MS, for plaintiffs.

William Matthew Vines, Page, Kruger & Holland, Jackson, MS, for defendant.

## OPINION

DAVIDSON, Chief Judge.

On or about May 4, 2001, Plaintiffs filed their complaint for reimbursement and declaratory relief. Plaintiffs seek a judicial declaration as to Defendant Pennsylvania National Mutual Casualty Insurance Company's ("Penn National") duties and Plaintiffs' rights under the Penn National policies. The complaint asserts causes of action for, *inter alia,* breach of contract against Defendant Penn National. This cause proceeded to a bench trial which concluded on March 24, 2003.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court issues the following findings of fact and conclusions of law.

### A. Factual Background

The Plaintiffs, Certain London Market Insurance Companies, Allianz Insurance Company, and Zurich American Insurance Company (collectively "Plaintiff insurers") filed this declaratory action against Defendants Penn National and Performance Fiberglass and Linings, Inc. ("Performance"), seeking recovery of certain sums expended on behalf of Kerr–McGee Chemical Corp. ("Kerr–McGee") in settling two personal injury lawsuits. Kerr–McGee subsequently joined the suit as a Plaintiff.

On or about March 17, 1998, Performance entered into an insurance contract with Penn National. This insurance contract contained a Commercial General Liability ("CGL") policy and a Commercial Umbrella Liability ("Umbrella") policy. Thereafter, on or about April 23, 1998, Performance entered into a "Master–Work Agreement for Construction and Field Services" ("Master–Work Agreement" or "MWA") with Kerr–McGee. Under the MWA, Performance agreed to perform certain rubber lining and fiberglass work at Kerr–McGee's electrolytic plant in Hamilton, Mississippi. The MWA contained a clause requiring Performance to carry liability insurance and an indemnity clause which purports to hold harmless Kerr–McGee for losses or damages. These are discussed in greater detail below.

On May 12, 1998, Bobby Reid, President of Performance, and Jimmy Kemp, a Performance employee, were injured in a fire at Kerr–McGee's Hamilton facility while doing work there pursuant to a Work Order. Both employees filed lawsuits in Mobile, Alabama, against Kerr–McGee alleging that Kerr–McGee was liable for personal injuries and other damages ("Mobile Actions"). Kerr–McGee demanded that Performance and Penn National defend and indemnify Kerr–McGee in the Mobile Actions. Performance and Penn National refused. As a result, Kerr–McGee gave notice to its insurers, Certain London Market Insurance Companies, Allianz, and Zurich, of the

claims. Ultimately, the parties settled the Mobile Actions.

Thereafter, Plaintiffs filed their complaint for reimbursement and declaratory relief. The complaint asserts that "pursuant to the terms of the Master–Work Agreement, Kerr–McGee was an additional insured pursuant to the terms of the [Penn National] Policy and/or Umbrella Policy." Plaintiffs seek a judicial declaration as to Penn National's duties and Plaintiffs' rights under the Penn National policies, including that Penn National is obligated to indemnify Plaintiffs for the settlement of the Mobile actions. Plaintiffs requested that the court order and direct that Penn National is obligated to defend, indemnify and hold Plaintiffs harmless. Plaintiffs also requested that the court order "that Performance . . . is obligated to indemnify, defend and hold London Market Companies, Allianz and Zurich harmless from and against any and all losses." However, prior to trial, both Kerr–McGee and Performance were dismissed. Thus, the Plaintiff-insurers only seek coverage and recovery from Defendant Penn National. The court has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.[1]

### B.  Discussion

#### 1.  Proper Parties—London Insurers

■ After the briefing was complete on the motion for summary judgment, Penn National asserted in its findings of fact and conclusions of law and at trial that Plaintiff "Certain London Market Insurance Companies" is not a proper legal entity and/or they do not have standing because there is no evidence that those companies insured Kerr–McGee.

Kerr–McGee's insurance coverage was split between domestic companies and London companies. Kerr–McGee had a self-insured retention, which is similar to a deductible, in the amount of $1 Million. Kerr–McGee spent over $4 Million to settle the two Mobile actions. Thus, the total amount Kerr–McGee was reimbursed by its insurers was, $3,602,207.72. Fifty percent, or $1,801,103.86, was reimbursed by the London Insurers, and the remaining fifty percent was paid by the three domestic insurers.[2] At trial, the Plaintiffs produced evidence, including one live witness and one video deposition, that the various companies insuring Kerr–McGee, including the London companies, actually reimbursed Kerr–McGee in the amount of $3,602,207.72 for costs incurred in settling the Mobile Actions.

Plaintiffs submitted Kerr–McGee's contract with the London companies, which states "this is to certify that the undersigned have procured insurance as hereinafter specified from Insurance companies, (hereinafter called the 'Underwriters') through our brokers in London, England . . . ." Ex. P–29. The Contract also states that it is "effected with Lloyd's Underwriters . . . ." Kerr–McGee's London insurance was divided between four companies or underwriters. The contract shows the percentage of risk each underwriter agreed to assume. The four companies that subscribed to the policy are: Commercial Union Assurance Company, PLC;

---

1. According to the complaint, Allianz is a California corporation with its principal place of business in California. Zurich is a New York corporation with its principal place of business in Illinois. Certain London Market Insurance Companies are foreign entities with their principal place of business in the United Kingdom. Defendant Penn National is a Pennsylvania corporation with its principal place of business in Pennsylvania.

2. Allianz and Zurich are two of the American companies that insured Kerr–McGee. The third domestic company is not a party to this suit.

Ocean Marine Insurance Company, Limited; Assicurazioni General, S.p.A.; and Yorkshire Insurance Company, Limited. Penn National, without citing any authority, appears to argue that each of these companies should be named as a plaintiff.

At the bench trial, counsel for Plaintiffs argued that due to the nature of the London insurance market, it is entirely proper to name as a plaintiff: "Certain Underwriters at Lloyd's, London" or "Certain London Market Insurance Companies." Alternatively, Plaintiffs moved, *ore tenus*, to amend the complaint to add the names of the four foreign companies that subscribed to the London policy. Naturally, Penn National opposed this amendment.

The Second Circuit has described the unique London insurance market as follows:

> Lloyd's [of London] has developed into one of the world's leading markets for insurance. This market, however, operates in accordance with age-old customs that are, to say the least, unusual in American business law.
>
> The anonymous underwriters of Lloyd's insurance, who are commonly referred to as "Names," invest in a percentage of the policy risk. While the rewards of a Lloyd's investment can be great, each Lloyd's Name is exposed to unlimited liability, but only for his or her share of the loss on a policy that the Name has underwritten. In other words, the liability of each Name on any given policy, while unlimited, is several and not joint. Insurance from Lloyd's is typically subscribed to by hundreds of Names belonging to different subgroups known as "syndicates."

*E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998) (citations omitted).[3]

A sample of cases shows that the London insurance parties are often named differently. Some suits have in fact named the various companies or underwriters

---

**3.** Some courts have struggled with jurisdictional issues associated with the London Market such as trying to determine citizenship of the parties for diversity purposes. *See e.g., E.R. Squibb & Sons, Inc.*, 160 F.3d 925; *Indiana Gas Co. v. Home Ins. Co.*, 141 F.3d 314 (7th Cir.1998)(holding that complete diversity did not exist between the parties because the complaint named as defendants "Certain Underwriters at Lloyd's, London" and "Certain London Market Insurance Companies." Because these entities were not corporations, the court treated them as partnerships for purposes of diversity jurisdiction, and since at least one Lloyd's Name was domiciled in the same state as the plaintiff, complete diversity did not exist.); *Certain Interested Underwriters at Lloyd's v. Layne*, 26 F.3d 39 (6th Cir.1994); *McAuslin v. Grinnell Corp.*, No. CIV.A.97–775, CIV.A.97–803, 2000 WL 1059850 (E.D.La. Aug.1, 2000).

Penn National has not challenged the *jurisdiction* of this court, only whether Certain London Market Insurance Companies is a proper party. In the above mentioned cases, the London companies subscribing to the Insurance policy were not incorporated, thus, the courts essentially had to look to the citizenship of all the members or Names. Beginning in the mid–1990s, Lloyd's permitted corporations to be Names, and not just individuals. It appears that the companies subscribing to the London agreement in the case *sub judice* are corporations or similar limited liability companies under foreign law, which would mean that the court would only have to look to the citizenship of each corporation, not the citizenship of all the individual Names. As such, the court is satisfied the requirements of complete diversity of citizenship are met in this case.

In any event, most likely because of Lloyd's now permits corporations to be Names, the Fifth Circuit has not had occasion, or has declined to engage in, such an analysis as the above cited cases to determine diversity of citizenship pursuant to 28 U.S.C. § 1332 when "Certain Underwriters of Lloyd's London", or similarly named parties are in federal court. *See, e.g., Norfolk Shipbuilding & Drydock Corp. v. Seabulk Transmarine Partnership, Ltd.*, 274 F.3d 249 (5th Cir.2001); *De-Leon v. Lloyd's London, Certain Underwriters*, 259 F.3d 344 (5th Cir.2001).

subscribing to the agreement. *See, e.g., Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc.,* 112 F.3d 184 (5th Cir.1997)(also naming as Plaintiffs: London & Hull Maritime Insurance Company Ltd., Commercial Union Assurance Company, and others). In some of the cases, the parties specifically list the specific policy subscribed to, in addition to "Certain Underwriters at Lloyd's, London." *See, e.g., Certain Underwriters at Lloyd's, London v. Fidelity and Casualty Ins. Co.,* 4 F.3d 541 (7th Cir.1993)(Naming Plaintiff as "Certain Underwriters at Lloyd's, London, and Companies in Interest, subscribing to London policy number 79 DD 193C"); *Houston Casualty Co. v. Certain Underwriters at Lloyd's London,* 51 F.Supp.2d 789 (S.D.Tex.1999)(naming party as "Certain Underwriters at Lloyd's London subscribing to Reinsurance Policy No 839/DA44790"). Still others simply name "Certain Underwriters at Lloyd's, London." *See, e.g., Certain Underwriters at Lloyd's, London v. Sinkovich,* 232 F.3d 200 (4th Cir.2000); *Certain Underwriters at Lloyd's London v. A & D Interests, Inc.,* 197 F.Supp.2d 741 (S.D.Tex.2002); *Certain Underwriters at Lloyd's of London v. Knostman,* 783 So.2d 694 (Miss. 2001). The court's research could not find a case that held that "Certain London Market Insurance Companies" or "Certain Underwriters of Lloyd's of London" was an improper party entity. As such, and because of Penn National's lack of any authority to the contrary, the court is of the opinion that Plaintiff Certain London Market Insurance Companies is properly designated for the purposes of this cause of action.

Additionally, Federal Rule of Civil Procedure 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." Rule 17(a) further states "a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought . . . ." Finally, "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification . . . or substitution of, the real party in interest." Fed. R.Civ.P. 17(a). Even assuming,*arguendo,* that each of the four foreign companies that subscribed to the London insurance agreement should have been named, the court would have granted Plaintiffs' motion to amend, pursuant to Rule 17. To reiterate, as best the court can tell, the law does not require such, and the motion to amend is denied as unnecessary.

### 2. The Merits—Insurance Coverage Dispute

This case requires the interpretation of the MWA, a contract between Kerr-McGee and Performance, and Performance's insurance contracts with Penn National. Furthermore, this case requires the court to determine what effect, if any, Mississippi Code § 31–5–41 has on the above mentioned contracts.

The MWA contains the following provisions pertaining to insurance and indemnification:

7. INSURANCE: Contractor [Performance] shall, at its expense, carry and maintain while performing any Work under a Work Order insurance policies in a company or companies satisfactory to the Company [Kerr-McGee] of the following types and of not less than the following amounts:

. . . .

(b) Comprehensive General Liability Insurance covering all operations . . . with combined limits of Five Hundred Thousand Dollars ($500,000) for bodily injury, including death, and

property damage as to any one occurrence or as to any one claim.

The Comprehensive General Liability Insurance shall name the Company as defined in Paragraph 8(b) as additional insured with respect to all Work to be performed under this Agreement, shall include contractual liability coverage for the indemnity provisions contained in Paragraph 8(a), shall contain a broad form property damage endorsement, and the coverage of such policy shall be primary without regard to any insurance carried and maintained by the Company....

Prior to commencing the Work under the first Work Order, Contractor shall furnish Company with certificates of insurance evidencing the above coverages and endorsements ....

Upon request the Contractor shall furnish Company with a copy of each such policy. Contractor further agrees to provide the Company with any special insurance and additional coverages or limits which the Company may by notice to Contractor require, the reasonable cost thereof to be reimbursed to Contractor by the Company.....

8. INDEMNITY:

(a) Contractor agrees to indemnify, defend and hold the Company free and harmless from and against any and all losses, damages, bodily injuries :.. fines, penalties, and expenses directly or indirectly arising out of or resulting from: (i) the performance of the Work under a Work Order by Contractor or its subcontractors or from any operation or activity of Contractor or its subcontractors in connection therewith or (ii) any failure by Contractor or its subcontractors to comply with the requirements of this Agreement or of the Work Order.

It is undisputed that "Kerr–McGee" is not specifically listed as an insured under the Penn National policy. In both the CGL policy and the umbrella policy, the only "named insured" is Performance. It is not clear why Performance never requested for Kerr–McGee to be named as an additional insured under the Penn National policy. As the Plaintiffs have settled with Performance, the court need not discuss any cause(s) of action Plaintiffs may have had against Performance, including, failure to procure insurance.

Even though Kerr–McGee was not specifically listed as a named insured, Plaintiffs contend that the following language automatically provided them additional insured coverage. The CGL policy states in the Exclusions section:

2. **Exclusions**

This insurance does not apply to:

...

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply for damages:

...

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement....

Section V–"Definitions" of the CGL policy provides in part:

8. "Insured contract" means:

...

f. That part of any other·contract or agreement pertaining to your business ... under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort lia-

bility means a liability that would be imposed by law in the absence of any contract or agreement.

Plaintiffs argue that Section 2(b)(2) above, which is an exception to an exclusion, read together with the definition of "insured contract," provided Kerr–McGee coverage as an additional insured. Further complicating matters in the case *sub judice* is Miss.Code § 31–5–41, which makes certain promises in construction contracts "to indemnify or hold harmless another person from that person's own negligence . . . void as against public policy and wholly unenforceable." Both of these issues are discussed below, in section b.

### a. Interpreting the Indemnity Provision

■ Penn National first argues that there is nothing in the Indemnity Provision of the MWA that specifically states that Performance agreed to indemnify Kerr–McGee for Kerr–McGee's own negligence. In other words, Penn National takes the position that Performance only agreed to indemnify Kerr–McGee for costs incurred by Kerr–McGee arising out of Performance's negligence. If Penn National were correct, that would likely end the matter.[4] Penn National repeatedly mentions that the indemnity provision does not specifically or expressly state that Performance agreed to indemnify Kerr–McGee for Kerr–McGee's own negligence. However, Mississippi law does not require that the indemnity contract *expressly* provide such.

■ At one time, the majority of jurisdictions would frequently require an indemnity provision to expressly provide that it applied to losses caused solely by the indemnitee's own negligence. *City of Jackson v. Filtrol Corp.*, 624 F.2d 1384, 1388 (5th Cir.1980). That is not the law in Mississippi, where broad language of indemnification is clear and unequivocal enough to protect an indemnitee against the consequences of his own negligence. *City of Jackson*, 624 F.2d at 1388 (citing *Blain v. Sam Finley*, 226 So.2d 742 (Miss. 1969)). *See also, Martin v. Sears, Roebuck & Co.*, 24 F.3d 765, 767 (5th Cir.1994)(quoting *Blain*, 226 So.2d at 746) (Under Mississippi law, an indemnitee will be indemnified against its own negligence "when the contract shows by clear and unequivocal language indicating that this is the intention of the contracting parties.").

In *Blain v. Sam Finley*, which Penn National cites, the Mississippi Supreme Court stated the determinative issue in the case revolved around the interpretation given to the indemnity provisions. The court stated:

> some courts have held that in order for an indemnitee to be indemnified against his own negligence, the indemnity contract must contain express language to that effect. However, the better rule and that which is followed by a majority of the courts is that the indemnitee will be indemnified against his own negligence when the contract shows by clear

---

4. At the bench trial, counsel for Penn National did not expressly concede this argument. Nevertheless, he then went on to argue in the alternative, the effect of Miss.Code § 31–5–41, which applies only to promises and agreements "to indemnify or hold harmless another person from that person's own negligence," to the case *sub judice*. Counsel for Penn National did state to the court that the effect of the Mississippi statute (discussed in the next section) is "really the heart of this case." Thus, it appears that Penn National is implying that the indemnification provision was in fact written to cover Kerr–McGee even if Kerr–McGee was the only party negligent. In any event, out of an abundance of caution, the court will examine Penn National's first argument that the indemnify provision was written only to apply to Performance's own negligence.

and unequivocal language that this is the intention of the contracting parties.

*Blain,* 226 So.2d at 746 (citations omitted). The court ultimately came to the conclusion that by construing the two sections at issue together, "the intention of the contracting parties to indemnify the contractor, Blain, against his own negligent acts is clearly and unequivocally shown." *Id.*

Courts from other jurisdictions have also held that similar hold harmless provisions to the one in the case *sub judice* were written to indemnify the indemnitee against his own negligent acts. In *Healey v. J.B. Sheet Metal, Inc.,* 892 P.2d 1047 (Utah App.1995) the Utah Court of Appeals noted that there is "a growing trend to relax some of the strictness of the rule of construction [that a party is contractually obligated to assume ultimate financial responsibility for the negligence of another when that intention is 'clearly and unequivocally expressed'] when the indemnity arises in a commercial context." *Healey,* 892 P.2d at 1049 (citations omitted). Furthermore, "[i]n such circumstances it is not necessary that the exculpatory language refers expressly to the negligence of the indemnitee, so long as the intention to indemnify can be 'clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances.'" *Healey,* 892 P.2d at 1049 (citing *Freund v. Utah Power & Light Co.,* 793 P.2d 362 (Utah 1990); quoting *Niagara Frontier Transp. Auth. v. Tri–Delta Constr. Corp.,* 107 A.D.2d 450, 487 N.Y.S.2d 428, 430 (1985)).

The Agreement in *Healey* contained the following indemnity provision:

(a) General Liability: Sub–Contractor shall indemnify and save General Contractor, its officers or agents harmless from and against any and all loss, damage, injury, liability, and claims thereof for injuries to or death of persons, and all loss of or damage to property of others, resulting directly or indirectly from Sub–Contractor's performance of this contract.

The court focused on the all inclusive terms, "any and all", and concluded that the paragraph as a whole expressed a clear and unequivocal intent by the parties that the licensee would indemnify the licensor form any and all liabilities, including liability that arises because of the licensor's negligence. *Healey,* 892 P.2d at 1049–50. However, the court ultimately held that the indemnity provision was void as a matter of public policy, as Utah has a statute similar to Mississippi Code § 31–5–41, which makes indemnity agreements for the negligence of the indemnitee or promisee in construction contracts "void and unenforceable." *Id.* at 1052.

In sum, it appears that based on the above mentioned authorities, that the broad language of indemnification is clear and unequivocal enough to protect the indemnitee, Kerr–McGee, against the consequences of its own negligence.

b. The CGL Policy and Mississippi Code § 31–5–41

■ Penn National argues in the alternative, that even if the language in the indemnity provision of the MWA could be read as binding Performance to indemnify Kerr–McGee for Kerr–McGee's own negligence, then the agreement is void as contrary to Mississippi public policy. Miss. Code § 31–5–41, states:

With respect to all public or private contracts or agreements, for the construction, alteration, repair or maintenance of buildings, structures, ... or gas distribution systems, or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise and/or agreement contained therein to indemnify or hold harmless another person from that person's own negli-

gence is void as against public policy and wholly unenforceable.

This section does not apply to construction bonds or insurance contracts or agreements.

It is clear that, because of Mississippi Code § 31–5–41, if Performance had not been insured, Kerr–McGee could not force Performance to indemnify Kerr–McGee for the settlement of the Mobile Actions. The question before the court is, what effect does the statute have on Penn National.[5]

Both parties spend much time arguing whether or not the MWA was an "insured contract," pursuant to the terms of the Penn National policy, and therefore whether or not Kerr–McGee was an additional insured. Penn National argues that since the indemnity agreement is void as contrary to Mississippi public policy, it cannot possibly be an "insured contract." In other words, if the indemnity agreement was void, then there never was a contract to insure in the first place, and there can be no "insured contract" coverage in this case.

Plaintiffs do cite cases from jurisdictions other than Mississippi where courts have found coverage language similar to "[a]ssumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement", when read in conjunction with an indemnity provision, to cover the property owner or indemnitee. *See e.g., Saavedra v. Murphy Oil U.S.A. Inc.*, 930 F.2d 1104 (5th Cir.1991)(applying Louisiana law); *Rupp v. American Crystal Sugar Co.*, 465 N.W.2d 614 (N.D.1991)(applying North Dakota law). As is discussed in greater detail, those jurisdictions did not have a statute similar to Miss.Code § 31–5–41.

Although not cited by either party, *Crosby v. General Tire & Rubber Co.*, 543 F.2d 1128 (5th Cir.1976), was the first case to interpret Miss.Code § 31–5–41 and has many similarities to the case *sub judice.* Plaintiff Crosby worked for Vulcan Painters and was badly burned while on the job at the Mississippi plant of General Tire and Rubber Company ("General Tire"). Crosby filed suit against General Tire, asserting that they had departed from the standard of ordinary care with respect to the safety of plaintiff's workplace. General Tire filed a third party complaint seeking indemnification from Vulcan and from Vulcan's liability insurer, Assurance. The Fifth Circuit held that the written contract entered into by General Tire and Vulcan, which contained a promise by Vulcan to hold General Tire harmless for all liability arising out of performance of the work, was void under the Mississippi statute. *Crosby*, 543 F.2d at 1130.

At that time, the statute was virtually the same as it is today, although the statute was divided into two parts: (a) the main provision, and (b). *Id.* (quoting Miss. Code. § 31–5–41). General Tire apparently made a similar argument that they

---

**5.** The Mississippi Supreme Court has only addressed Mississippi Code § 31–5–41 in one case, which is not analogous to the case *sub judice* because the indemnity provision was contained in a licensing contract, not a construction contract, and as such, the statute did not apply. *Heritage Cablevision v. New Albany Electric Power System*, 646 So.2d 1305, 1312 (Miss.1994).

The Mississippi Court of Appeals has, on one occasion, addressed the statute. *See Accu–Fab & Construction, Inc. v. Ladner*, No. 96–CA–00692, 2000 WL 274291, (Miss.App. 2000). The court held that the construction contract at issue was void where Anderson sought indemnification for its negligent actions. *Accu–Fab & Construction, Inc.*, 2000 WL 274291, at *8. However, that case did not deal with the issue of what effect a void indemnity contract has on the contractor's insurer.

should be able to recover from Vulcan's insurer, Assurance, even if the indemnity agreement was void as to Vulcan. The court stated:

> General Tire contends that only uninsured indemnity agreements are voided by the statute, because insured agreements are preserved by section (b), which states that "(t)his act does not apply to construction bonds or insurance contracts or agreements."
>
> General Tire's interpretation of section (b) contradicts the plain language of the section. *Section (b) exempts insurance contracts, not insured indemnity contracts, from the operation of section (a).* The purpose of section (b) can be illustrated in this way. If General Tire had realized that it could not rely on the indemnity agreement with Vulcan to protect it against liability, it likely would have arranged for its own liability insurance. Such an insurance contract would have come within the terms of section (b). The drafters of the statute, we conclude, did not mean to abrogate such insurance agreements and, perhaps out of an abundance of caution, they added section (b).
>
> Section (b) in fact operates to preserve the agreement between Vulcan and its insurer, Assurance. But that does General Tire no good, because section (a) cuts the link between Vulcan and General Tire, and General Tire can reach Assurance only through Vulcan.

*Id.* at 1131 (Emphasis added).

The example given above by the Fifth Circuit is helpful in determining the purpose of the last sentence of the statute, "[t]his section does not apply to construction bonds or insurance contracts or agreements." At the bench trial, counsel for Penn National briefly stated that he read the last sentence of the Mississippi statute to apply where a contractor, such as Performance, got liability insurance to cover itself. Then, once an accident or injury occurred that was covered under the policy, the insurance company could not avoid paying the named insured-contractor by asserting that this was "indemnification" in violation of the statute. This also seems plausible and consistent with *Crosby.* The language in *Crosby* supports Penn National's position that because the statute renders the indemnity agreement void, Performance never assumed any liability under the Master–Work Agreement, and as such, Penn National is not liable.

The parties also raise the issue of what effect the settlement of the Mobile actions has on this case, which was also addressed in *Crosby.* The Plaintiffs assert that they are entitled to equitable subrogation and point out that no court ever found Kerr–McGee negligent, thereby attempting to shift all or some of the fault to Performance and/or the injured employees. In *Crosby,* General Tire (the Company) argued that even if the Mississippi statute blocked indemnity for General Tire's own negligence, the statute would not prohibit recovery under the hold harmless agreement for the portion of the settlement attributable to Vulcan's (Contractor) negligence. *Crosby,* 543 F.2d at 1130. The Fifth Circuit stated "[f]or the purpose of this discussion, we treat the Crosby settlement as recompense for General Tire's liability to Crosby[;] liability generated by Crosby's actual negligence." *Id.* The court noted that if the suit had not ended in settlement, the fact finder would have either concluded that General Tire was negligent, or that they were not. *Id.* at 1131, n. 1. The court stated:

> Because the settlement was settlement of the suit by Crosby against General Tire, the settlement must be considered recompense to Crosby for General Tire's liability. Indeed, in any indemnity proceeding, General Tire's threshold burden would be to show that it was liable to

Crosby and that the settlement, therefore, was not the act of a volunteer. See *Bush v. City of Laurel*, 215 So.2d 256, 260 (Miss.1968); *Southwest Mississippi Electric Power Association v. Harragill*, 254 Miss. 460, 182 So.2d 220 (1966). *Id.* As such, the court finds that Plaintiffs' argument is not well taken.

*Posey v. Union Carbide Corp.*, 507 F.Supp. 39 (M.D.Tenn.1980), involved a district court in Tennessee interpreting a similar statute voiding certain indemnification contracts.[6] In *Posey*, the heirs of Posey, who was an employee of Maury Steel, sued Union Carbide after Posey died while working on the construction of a roof at the Union Carbide plant. Union Carbide and Maury Steel had entered into an indemnification agreement which purported to indemnify and/or hold harmless Union Carbide.

Maury Steel had two liability policies with two different insurance companies. Union Carbide, as a third party plaintiff, argued that it had the rights of an "insured" under at least one of the policies. One of the insurance contracts covering Maury Steel provided that an "Insured" is: "any person, organization, . . . to whom or to which the Named Insured (Maury Steel) is obligated by virtue of a written contract to provide insurance such as is afforded by this policy." *Posey*, 507 F.Supp. at 40. The court concluded that the portion of the construction contract which purported to hold Union Carbide harmless was void and unenforceable. *Id.* at 41. The court went on to state "a void agreement cannot be called an obligation and therefore Union Carbide is not an insured under First

State's contract with Maury Steel." *Id.* The court stated, "[s]imply put, the liability of both insurance companies rests on the liability of Maury Steel" and as such, neither of the insurance companies could be forced to cover Union Carbide. *Id.*

Plaintiffs cite a Fifth Circuit case where the parties were similarly aligned as in the case *sub judice*, where the Fifth Circuit held for the third party plaintiff that claimed it was an additional insured pursuant to somewhat similar indemnity and hold harmless agreements together with the contractor's liability insurance policies. *Saavedra v. Murphy Oil U.S.A. Inc.*, 930 F.2d 1104 (5th Cir.1991). Again, the court is of the opinion that the *Saavedra* case is inapposite as the Fifth Circuit was interpreting Louisiana law, which does not have a statute declaring such indemnity agreements void as against public policy.

Plaintiffs also cite one Fifth Circuit case for the proposition that whether the indemnification provision in a Master Service Agreement is void between the two contracting parties is a different question than whether the indemnitee company should be denied coverage as an additional insured under a policy between the contractor and its insurer because the Master Service Agreement is not an "insured contract." *Mid–Continent Casualty Co. v. Swift Energy Co.*, 206 F.3d 487 (5th Cir. 2000). There, the Fifth Circuit noted that "[t]here is a lack of case law addressing the effect of unenforceable indemnity language on insured contract coverage." *Mid–Continent Casualty Co.*, 206 F.3d at 493 (quoting Douglass R. Richmond & Darren S. Black, *Expanding Liability*

---

6. *See* Tenn.Code § 62–6–123 (formerly Tenn. Code § 62–624). At the time, Tenn.Code § 62–624 provided in pertinent part:

A covenant, promise, agreement . . . in or in connection with . . . a contract . . . relative to the construction, alteration, repair or maintenance of a building . . . purporting to

indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons . . . caused by or resulting from the sole negligence of the promisee, . . . or indemnitee, is against public policy and is void and unenforceable.

Coverage: Insured Contracts and Additional Insureds, 44 DRAKE L. REV. 781, 795 (1996)). While the parties made some of the same arguments in the *Mid–Continent* case, it is distinguishable because the Texas statute in question was different than Mississippi Code. § 31–5–41, and more importantly, the Master Agreement in *Mid–Continent* did not violate the Texas Act; whereas here, the indemnity agreement is clearly void under Miss.Code. § 31–5–41.

The *Mid–Continent* court stated:

> Both sides have feasible arguments. Swift argues that Mid–Continent intended to assume Swift's tort liability and thus we should treat the M.S.A. § as an "insured contract" within the context of interpreting the policy. On the other hand, if the indemnity provisions of the M.S.A. § are unenforceable, Mid–Continent never actually assumed Swift's liabilities. Arguably, then, the M.S.A. § would not qualify as an insured contract.

*Id.* at 493 (citations omitted).

However, the Fifth Circuit then delved into the merits of whether the indemnity provision was actually void under the Texas Act (TOAIA). The court stated:

> Out of an abundance of caution, we nevertheless assume without deciding that, if the MSA's indemnity provisions were clearly invalid under or offensive to the TOAIA, it might affect the MSA's status as an "insured contract" under the Policy.

*Id.* After examining the Texas Act at issue, the court noted that the Act contained an exception permitting indemnity provisions supported by liability insurance satisfying certain requirements of section 127.005.

*Mid–Continent Casualty Co.*, 206 F.3d at 493. The court ultimately concluded that "[t]he M.S.A. § appears to comply with Section 127.005." *Id.*

In conclusion, Penn National's argument is well taken. As the Fifth Circuit stated in *Crosby*, the sentence " '[t]his act does not apply to construction bonds or insurance contracts or agreements' exempts insurance contracts, not insured indemnity contracts, from the operation of [the statute]". *Crosby*, 543 F.2d at 1131. It seems logical that since the indemnity provision is void, Performance, and as a result Penn National, never actually assumed any of Kerr–McGee's liabilities under the CGL policy.

### c. The Umbrella Policy

██ The Plaintiffs have also asserted that the language in the umbrella policy, which is different than the CGL policy language, provides them coverage. The umbrella policy, states in pertinent part:

SECTION II–WHO IS AN INSURED

2. Each of the following is also an insured:

g. Any person or organization for whom you agreed in writing to provide this insurance for operations you perform or facilities you own or use. This insurance is subject to your "applicable underlying limits" for such operations or facilities.

Penn National argues that Performance never agreed in writing to provide "this insurance"; i.e., an umbrella policy.[7]

The Plaintiffs focus on the language in the MWA that states:

---

**7.** As best as the court can tell based on the authorities and arguments of the parties, the language in the umbrella policy does not require analysis of Miss.Code § 31–5–41. This is because, under the language in the umbrella policy, the court does not have to determine whether Performance assumed the tort liability of another party to pay for bodily injury.

Contractor shall, at its expense, carry and maintain ... insurance policies in a company ... satisfactory to the Company of the following types and of not less than the following amounts:

....

(b) Comprehensive General Liability Insurance covering all operations ... with combined limits of Five Hundred Thousand Dollars ($500,000) for bodily injury ....

The Plaintiffs argue that because the MWA states "not less than" $500,000, this was just a minimum. However, the "type" of policy specified is CGL coverage, not an umbrella policy.[8] Plaintiffs do admit, however, that Performance was not required to have any umbrella or excess coverage.

Although not cited by either party, *Musgrove v. Southland Corp.*, 898 F.2d 1041 (5th Cir.1990) is similar. Citgo entered into a contract with LCE to do electrical maintenance work at a Citgo refinery. Two employees of LCE were killed while doing said work. The survivors of the decedents sued Citgo, LCE, and others. After settling the survivors' claims Citgo filed third-party complaints against LCE and its insurers, St. Paul and International, seeking recovery of the settlement amounts.

LCE had a CGL insurance policy with St. Paul and an excess policy with International. Citgo was not named or otherwise covered under the CGL policy, because "[d]espite contract obligations requiring it to do so, LCE failed to name Citgo as an additional insured under either policy until after the fatal accident." *Musgrove*, 898 F.2d at 1043. Citgo argued that it was an "insured" under the excess policy International issued to LCE. Citgo argued that the excess policy dropped down to cover losses under $1 Million in the event the primary policy did not provide coverage. *Id.* the court stated:

Citgo bases its argument on the definition of "insured" in the International policy, which includes "any person, organization, trustee or estate to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy...." Citgo's purchase order contract with LCE obligated LCE to provide comprehensive general liability insurance of not less than $1 million per occurrence for itself and Citgo. Because the International policy covers only those losses in excess of $1 million, that policy does not afford the coverage which LCE's contract with Citgo required.

*Id.* Citgo argued that LCE's voluntary decision to obtain excess liability coverage for itself triggered an obligation to obtain the same coverage for Citgo. The Fifth Circuit rejected that contention. *Id.*

The same analysis applies to this case. It is undisputed that Performance was not required to obtain the umbrella policy. As such, Plaintiffs arguments are not well taken.

### C. Conclusion

In sum, the court finds that Penn National is not required to indemnify Plaintiffs for settlement of the Mobile Actions. For the above mentioned reasons, including the effect of Mississippi Code. § 31–5–41, Penn National was not required to defend or otherwise cover Kerr–McGee under these circumstances.

A separate order in accordance with this opinion shall issue this day.

---

**8.** Plaintiffs cite *BP Chemicals, Inc. v. First State Ins. Co.*, 226 F.3d 420 (6th Cir.2000) for support. However, in that case, it appears that BP (similarly situated to Kerr–McGee in this case) was insured under the primary CGL policy, which of course, is not the case here. *BP Chemicals, Inc.*, 226 F.3d at 425–26.

## JUDGMENT

After a bench trial and pursuant to an opinion issued this day, the court rules that

(1) the Defendant Pennsylvania National Mutual Casualty Insurance Company is not liable to the Plaintiffs;

(2) the Plaintiffs' claims are DIS-MISSED WITH PREJUDICE; and

(3) this case is CLOSED.