**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, Plaintiff,**

**v.**

**NORFOLK SOUTHERN RAILWAY COMPANY, et al., Defendants.**

**Case No. 3:16–cv–129**

United States District Court, E.D. Tennessee, Northern Division, at Knoxville.

Signed 10/06/2017

Alan M. Sowell, William H. Tate, Howard Tate Sowell Wilson Leathers & Johnson, PLLC, Nashville, TN, for Plaintiff.

Donald R. McMinn, Pro Hac Vice, Hollingsworth LLP, Washington, DC, Emily L. Herman-Thompson, Baker, O'Kane, Atkins & Thompson, Knoxville, TN, Lewis, Thomason, King, Krieg & Waldrop, P.C. (Knox), Knoxville, TN, for Defendants.

### ORDER

HARRY S. MATTICE, JR., UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiff's Motion for Summary Judgment (Doc. 42), and the Norfolk–Defendants' Motion for Summary Judgment (Doc. 51). For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Doc. 42) will be **GRANTED in part and DENIED in part**, and the Norfolk–Defendants' Motion for Summary Judgment (Doc. 51) will be **GRANTED in part DENIED in part**.

## I. FACTS

One evening in May 2014, Darius Gallaher was driving his three friends—Jadah Gallaher, Hunter Crass, and Roderick Drummond—to Cracker Barrel to get dinner. Unfortunately, Darius and his friends did not make it to dinner that night. When crossing a railroad track at the Mountain View Crossing, a train collided into the car's passenger side and dragged the vehicle a considerable distance before coming to a stop. As a result of the collision, Roderick Drummond died at the scene of the accident. Darius and Jadah Gallaher and Hunter Crass were rushed to the emergency room in critical condition. Jadah eventually succumbed to her injuries and died at the hospital. Crass and Darius survived, but both are likely permanently injured by the accident.

The train that struck the car was owned and operated by Norfolk Southern Corporation and related entities (collectively "Norfolk"). Norfolk also maintained the Mountain View Crossing, the scene of the collision. Norfolk became aware of the accident shortly after it occurred, and it promptly investigated the incident.

Mountain View Crossing is a rural crossing. It did not have gates or warning lights like those typically seen at more modern crossings, and the tracks leading up to the crossing were surrounded by trees and shrubbery. Tennessee law and prudence required Norfolk to keep the vegetation surrounding the tracks from obstructing drivers' views at the crossing. In order to meet this obligation, Norfolk maintained a contract with East Coast Right of Way Maintenance, Inc. ("East Coast").

Under the contract (the "Vegetation Control Agreement"), East Coast was required to spray herbicide, monitor vegetation, and otherwise keep vegetation from obstructing the view at the Mountain View Crossing. The contract obligated East Coast to buy commercial general liability (CGL) insurance with a combined policy limit of $2 million. As part of that require-

ment, East Coast agreed to name Norfolk as an additional insured under the policy. East Coast upheld its end of the bargain and purchased a CGL policy from Cincinnati Specialty Underwriters Insurance Company ("Cincinnati") with a policy limit of $1 million. The Cincinnati policy included an "Additional Insured Endorsement" (the "AI Endorsement"), which amends the policy's definition of insured to include any entity East Coast agrees in writing to designate as an additional insured. East Coast also purchased Umbrella and Follow Form Excess coverage from American Guarantee & Liability Insurance Company ("AG"). AG's Excess coverage adopted the terms and conditions of the underlying Cincinnati policy, as is standard industry practice. Both the Cincinnati and AG policies were in effect at the time of the May 2014 Mountain View Crossing accident. The Vegetation Control Agreement also contained an indemnification provision in which East Coast promised to indemnify Norfolk for liability arising out of East Coast's acts or omissions.

Shortly after the accident, Roderick Drummond's estate threatened a lawsuit against Norfolk. Acting alone, Norfolk quickly settled the Drummond claim on August 20, 2014, three months after the accident. It would not be the end of the Mount View Crossing accident litigation. In January of 2015, Darius, Crass, and the estate of Jadah Gallaher filed a suit against Norfolk in Tennessee state court (the "Crass–Gallaher suit"). The complaint in the Crass–Gallaher suit alleged, among other things, that vegetation surrounding the Mountain View Crossing obstructed the view of drivers at the crossing.

For six months, Norfolk defended itself in the Crass–Gallaher suit. Norfolk did not formally notify or otherwise call upon East Coast or its insurers for a defense. Eventually, however, East Coast's President became ancillarily involved in the Crass–Gal-

laher suit when he was deposed by the plaintiffs' attorney in the suit. The deposition involved questions regarding East Coast's maintenance of the Mount View Crossing vegetation. Prior to the deposition, on July 31 2015, East Coast's President saw to it that East Coast's CGL insurers, Cincinnati and AG, were notified of the suit and upcoming deposition.

On September 11, 2015, nine months into the lawsuit, Norfolk contacted AG and Cincinnati by mail to formally notify them of the Crass–Gallaher suit. Neither AG nor Cincinnati responded to Norfolk's letter. As the Crass–Gallaher suit continued, the parties to the suit eventually agreed to mediate the claim. Around this time, on October 30, 2015, Norfolk sent a letter to East Coast demanding indemnification and notifying it of the upcoming mediation, which was set for November 10, 2015. Through East Coast, Cincinnati and AG were both aware of the letter and its contents. AG considered the letter Norfolk's first formal notice. On November 2nd, as the November 10th mediation approached, Norfolk again sent letters to AG and Cincinnati advising them of the mediation. Cincinnati did not reply, but AG responded to the letter by instructing Norfolk to "act as a reasonable uninsured in evaluating/acting upon any settlement offers at the mediation."

At the November 10th mediation, Norfolk and the Crass–Gallaher plaintiffs reached a settlement agreement. That same day, Norfolk promptly notified AG of the settlement. Two weeks later, Norfolk requested AG indemnify it for the Crass–Gallaher settlement. Not satisfied with AG's response, Norfolk sent a formal bad faith demand letter to AG on December 22, 2015.

On January 14, 2016, AG finally responded to the formal demand letter and requested Norfolk send materials related

to the Crass–Gallaher suit so AG could process the claim. Norfolk responded and asked AG to specify what relevant materials of the voluminous Crass–Gallaher record it wanted. It is not apparent what, if any, information was actually exchanged as a result of this interaction and subsequent interactions. On March 16, 2017, Cincinnati and Norfolk reached an agreement over indemnification related to the Crass–Gallaher suit. Two days after that agreement, AG filed this declaratory judgment action against Norfolk.

## II. LEGAL FRAMEWORK

### A. Jurisdiction

■ The Declaratory Judgment Act does not provide an independent basis of jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1977). Instead, a court can only hear a declaratory judgment action when it is founded upon an independent ground of jurisdiction. *Id.* Here, the case lies under diversity jurisdiction because complete diversity exists between the parties and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332(a).

### B. Declaratory Judgment Act

■ The Declaratory Judgement Act does not swing open the courthouse doors for litigants to come in and parse out their rights. *See Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Instead, the Act gives district courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). District courts, however, are not permitted to exercise this discretion blindly. *Western World Inc. Co. v. Hoey*, 773 F.3d 755, 759 (6th

Cir. 2014). Rather, courts must use sound discretion that is "hardened by experience into rule." *Id.* (quoting *Wilton*, 515 U.S. at 289, 115 S.Ct. 2137). To this end, the Sixth Circuit has identified five non-exclusive factors for courts to consider when deciding whether to hear a declaratory judgment action. *Id.* The factors—known as the *Grand Trunk* factors [1]—are as follows:

(1) Whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"

(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach upon state jurisdiction; [which is determined by asking]

 a. whether the underlying factual issues are important to an informed resolution of the case;

 b. whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

 c. whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action; and

(5) whether there is an alternative remedy which is better or more effective. *Western World*, 773 F.3d at 759.

■ Ultimately, the *Grand Trunk* factors are concerned with three things: efficiency, fairness, and federalism. *Id.* Be-

---

1. Named after the case that first listed the factors. *See Grand Trunk W. R. Co. v. Consol.*

*Rail Corp.*, 746 F.2d 323 (6th Cir. 1984).

fore addressing the factors, the Court notes the parties have not objected to the use of a declaratory judgment action in this venue; that is to say, all parties consent to the current form of this action. This fact is noted because it is relevant, but it is not determinative. *Id.* (holding discretion should not be controlled by the parties' wishes).

 Turning to the first and second *Grand Trunk* factors, the Court finds both support exercising jurisdiction. The principal consideration under both factors is preventing a piecemeal resolution of ongoing litigation being tried in different venues. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 555 (6th Cir. 2008). This consideration is balanced with the parties' interest in swiftly resolving a particular legal issue. *Id.* Here, there is no pressing concern of a piecemeal resolution. A declaratory judgment action would settle the controversy between the parties and would clarify the legal relations at issue. Because the underlying state tort actions were settled, Norfolk's liability has already been established. The only remaining issues revolve around whether East Coast and AG are liable to Norfolk. These issues do not directly relate to the rights of third parties in other ongoing lawsuits. A declaratory judgment would efficiently determine the existence and extent of AG's and East Coast's rights and obligations to Norfolk.

 The third *Grand Trunk* factor also supports exercising jurisdiction in this case. Preventing procedural gamesmanship is the ultimate policy concern underlying the third factor. Nothing in the record suggests AG brought this declaratory judgment action as a procedural hurdle in an attempt to delay resolution of Norfolk's substantive rights. As such, the third factor does not preclude exercising jurisdiction.

The fourth factor and its subparts are based on tenets of federalism. In this case,

there are no new or novel state law issues that must be addressed. Currently, there is not an underlying state court action that the Court will be impeding or contradicting by exercising jurisdiction. The case is capable of being resolved in federal court, and a state court does not offer any comparative advantages in resolving the case's factual disputes. As such, granting jurisdiction would not offend the traditional notions of federalism.

Finally, factor five does not preclude the exercising of jurisdiction. There are no alternative remedies that would be better or more effective. The Court finds resolution of the claims presented between AG and Norfolk will be most effectively resolved in this venue. Accordingly, factor five lends to the conclusion that declaratory judgment jurisdiction is appropriate here.

In sum, the *Grand Trunk* factors all support extending jurisdiction in this action. The Court finds exercising jurisdiction would be fair, lead to an efficient resolution of the case, and not violate principles of federalism. Accordingly, the Court, in its discretion, will exercise jurisdiction over this declaratory judgment action.

### C. Choice of Substantive Law

 Federal courts sitting in diversity cases apply the choice-of-law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Tennessee law, insurance policies—absent a choice-of-law clause—are governed by the substantive law of the state where the policy was issued and delivered. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). Here, both Cincinnati's and AG's policies were issued and delivered to East Coast in Tennessee. As such, Tennes-

see substantive law applies to the interpretation and effect of the insurance policies.

### D. Summary Judgment Standard

 Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its ... pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### III. ANALYSIS

 The general rules of contract construction apply to insurance contracts. *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990). Insurance policies should be read "as a whole in a reasonable and logical manner." *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998). Policy language is given its usual and ordinary meaning. *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993). If a policy provision can be interpreted in more than one way, it is ambiguous. *Id.* Because insurance policies

are contracts of adhesion, ambiguous terms that limit coverage are construed against the insurer in favor of the insured. *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996) ("[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy."). However, courts should be careful not to create ambiguities where none exist. *Setters v. Permanent Gen. Assur. Corp.*, 937 S.W.2d 950, 954 (Tenn. Ct. App. 1996). Unambiguous language is given its explicit effect without "favoring of either party in [its] construction." *Id.* Further, a policy exclusion will be upheld so long as it "merely limits coverage and does not totally emasculate a previously stated coverage." *Id.* When resolving coverage disputes, an insured carries the burden of showing their claim fits within the insurance policy, and if insured makes such a showing, the burden shifts to an insurer to establish a policy exclusion bars coverage. *Blaine Const. Corp. v. Ins. Co. of N. Am.*, 171 F.3d 343, 349 (6th Cir. 1999) (applying Tennessee law).

### A. Norfolk's Status as an Additional Insured

 As an initial matter it must be determined whether Norfolk is actually covered by East Coast's CGL policy. The most direct route for coverage, and the route Norfolk argues for, is coverage as an "additional insured" under the policy. As such, Norfolk's status as an additional insured must be established.

The crux of determining Norfolk's additional insured status depends on whether it fits into the requirements of the Additional Insured Endorsement (the "AI Endorsement") contained in Cincinnati's underlying policy. In its excess coverage, AG ratified the AI Endorsement when it explicitly adopted it and all the other underlying terms and conditions of the Cincinnati Policy. (*See* Doc. 1-3 at 11). With that being the case, if it fits within the AI Endorsement, Norfolk would be properly considered AG's additional insured. Apparently, AG does not dispute that it adopted the endorsement as part of its excess coverage; AG does, however, argue that Norfolk does not fit into the AI Endorsement's terms.

The significance of additional insured status should not be understated. Unless limited by a specific exclusion, an additional insured "enjoys the full benefits of the [named insured's] policy..." § 126:7 9 Couch on Ins. 3d, "Additional Insured." Once a party's additional insured status is established, its rights under the policy are not merely derivative of the named insured's rights. This is consistent with the AI Endorsement, which amends the definition of an "insured" to include additional insureds. If a policy provision applies to an "insured," then by the policy's terms it applies with the same force to an additional insured. Of course, a policy can specifically limit the extent of an additional insured's benefits, but here there are few significant limitations that apply only to an additional insured. In its brief, AG argues that Norfolk cannot recover under the policy because it has yet to establish East Coast's liability to Norfolk, and that AG's policy "comes into play *only* when East Coast becomes legally obligated to pay." (Doc. 46 at 23) (emphasis added). However, if Norfolk is an additional insured, it can, under the terms of the policy, seek indemnification from AG without having to first establish East Coast's liability. *See Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606 (Tenn. Ct. App. 2011) (holding an additional insured was eligible for coverage where the named insured enjoyed employer immunity).

The AI Endorsement reads as follows:

A. Section II—Who is an Insured is amended to include as an additional insured any person or organization when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy, but only with respect to "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

 1. Your acts or omissions in the performance of your ongoing operations for the additional insured;

 2. The acts or omissions of those acting on your behalf in the performance of your ongoing operations for the additional insured; or

 3. "Your Work" performed for the additional insured and included in the "products-completed operations hazard."

(Doc. 1–4 at 62–63).

### i. Written Agreement Requirement

AG makes two arguments that, if true, have the effect of leaving Norfolk outside the terms of the AI Endorsement. First, AG briefly argues that the AI Endorsement does not apply here because the Vegetation Control Agreement did not require East Coast to insure Norfolk as an additional insured in an "excess or umbrella policy," such as AG's policy. (Doc. 46 at 21). The complete language of the controlling provision in the Vegetation Control Agreement is as follows:

5.2. Insurance

Contractor shall, at its sole cost and expense, obtain and maintain during the period of this Contract, in a form and with companies satisfactory to [Norfolk] the following insurance coverages:

(c) Commercial General Liability Insurance with a *combined* single limit of not less than Two Million Dollars ($2,000,-000) per occurrence for injury to or

death of persons and damage to or loss or destruction of property.... In addition, such policy or *policies* shall be endorsed to name [Norfolk] as an additional insured...

(Doc. 1–2, at 13) (emphasis added). AG would assert that because the Vegetation Control Agreement only requires East Coast to add Norfolk as an additional insured to a "Commercial General Liability Insurance" policy, the AI Endorsement is inapplicable to Norfolk under AG's excess policy. This is because the AI Endorsement only extends additional insured status when the named insured "agree[s] in writing" to add an additional insured to East Coast's policy. The Court cannot agree with AG's reasoning. The argument is founded upon a narrow, hyper-technical reading of the Vegetation Control Agreement. The parties' actual intent can be gleaned from the complete text of the agreement. When considering the complete text, the agreement clearly contemplates multiple insurance policies. For instance, it references "policies" and "combined" limits, which seems to anticipate layers of coverage—such as the sort provided by a follow form policy. Further, "Commercial General Liability Insurance" can be read as a general term that refers to the subject matter covered by a policy, not the literal name of a specific policy. Moreover, AG's excess policy adopted Cincinnati's terms and conditions, and for all intents and purposes, is a CGL policy, albeit one that provides excess coverage over a primary CGL policy.

### ii. Causation Requirement

Next, AG asserts that Norfolk is not entitled to benefits because it has failed to establish East Coast was at fault for the accident. As already discussed, that does not preclude Norfolk's recovery if it is an additional insured; however, those facts

can be relevant to whether Norfolk is actually an additional insured in the first place. The AI Endorsement only extends additional insured coverage if the named insured, East Coast, "caused, in whole or in part," the event giving rise to liability. If the accident was not causally related to East Coast's acts or omissions, the AI Endorsement would be inapplicable.

The AI Endorsement language, "caused, in whole or in part," is standard language added to additional insured endorsements by the Insurance Services Office (ISO) [2] in 2004. *First Mercury Ins. Co. v. Shawmut Woodworking & Supply, Inc.*, 48 F.Supp.3d 158, 173 (D. Conn. 2014), *aff'd* 660 Fed.Appx. 30 (2d Cir. 2016). Endorsements prior to 2004 had held that an additional insured was covered for liability "arising out of" the named insured's work. *Id.* at 174. The previous policy language was interpreted liberally to apply to any incident so long as it was in some way related to the named insured's work. *See McIntosh v. Scottsdale Inc. Co.*, 992 F.2d 251, 255 (10th Cir. 1993). The *McIntosh* decision is unique in that, prior to trial, the parties stipulated that the additional insured "was 100% at fault" for the occurrence and the named insured shared none of the blame. *Id.* at 252. Despite the named insured being faultless, the *McIntosh* court still held the incident giving rise to liability was sufficiently related to the named insured's operations to meet the "arising out of" language of the endorsement. *Id.* at 255. After *McIntosh* and its progeny, the ISO felt the outcomes were not what it had intended, and it amended the language to require the named insured to be at least a partial cause of the incident giving rise to

liability. *Burlington Ins. Co. v. NYC Transit Auth.*, 29 N.Y.3d 313, 57 N.Y.S.3d 85, 79 N.E.3d 477, 485 (2017).

When courts interpret the "caused, in whole or in part" language, they typically assign it a liberal interpretation. For instances, some courts in New York have held that this new language is not materially different than the old "arising out of" language. *See Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Greenwich Ins. Co.*, (N.Y. App. Div. 2013). Other courts that have parsed the language have focused on the scope of the words "caused ... in part" and the degree of causation it requires. *See Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 597–98 (5th Cir. 2011). When resolving the issue, courts have typically held the required level of causation by the named insured to be minimal. *See Id.* at 601 (holding that named insured had to be only "1% or more responsible"); *see also Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 675–76 (3d Cir. 2016) (holding the language does not require the named insured to be a "substantial factor" in causing the incident), *First Mercury Ins. Co. v. Shawmut Woodworking & Supply Inc.*, 48 F.Supp.3d 158, 173 (D. Conn. 2014), *aff'd*, 660 Fed.Appx. 30 (2d Cir. 2016) ("[T]he progression from 'arising out of' to 'caused, in whole or in part, by' shows that ... the amendment was intended to require proximate causation by the insured rather than simply but-for causation."); *Thunder Basin Coal Co., L.L.C. v. Zurich Am. Ins. Co.*, 943 F.Supp.2d 1010, 1015 (E.D. Mo. 2013) ("By its plain language, the phrase "caused, in whole or in part," merely requires the named insured

---

**2.** The Insurance Services Office, Inc. is a private entity that provides statistical data and standardized policy language to insurance companies. The "association [is comprised] of approximately 1,400 domestic property and casualty insurers ... is the almost exclusive source of support services in this country for [commercial general liability ("CGL")] insurance. ISO develops standard policy forms ...; most CGL insurance written in the United States is written on these forms." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

or those acting on its behalf to have been at least partially responsible for the injuries alleged by the claimant.").

When interpreting an insurance policy, words are given their plain meaning. *Tata*, at 650,. Here, the phrase "caused, in whole or in part," is not ambiguous. In effect, it assigns Norfolk additional insured status if the accident was caused by East Coast's work, act, or omission in some way, even partially. Accordingly, it must be determined whether East Coast caused the accident.

The complaint in the underlying Crass–Gallagher suit alleged the vegetation surrounding the Mountain View Crossing obstructed the view of motorists. (Doc. 45, Ex. 3 at 6, 24) ("The heavy vegetation around this crossing causes severe visual obstructions...") ("the crossing ... [was] not adequately clear of brush, trees, ..."). East Coast was responsible for controlling the vegetation at the Mountain View Crossing, and if the vegetation growth contributed to the accident (as the Crass–Gallagher complaint suggests), East Coast can be seen as contributing to the accident, at least in part. For some courts, if the underlying suit alleges facts that can be attributed to causation on the part of the named insured, coverage is found at the summary judgment stage. *See Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 382–83 (4th Cir. 2015) (holding insurer had a duty to defend an additional insured when the underlying suit alleged facts that fell within the policy's coverage, even when named insured was no longer a direct defendant in the suit); *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 601 (5th Cir. 2011) (holding insurer had a duty to indemnify additional insured even when named insured was not part of the underlying suit due to employer immunity). However, both *Gilbane* and *Capital City* were applying

Texas and Maryland law respectively. Here, Tennessee law applies.

Under Tennessee law, the duty to defend and the duty to indemnify are distinct. *See St. Paul Fire & Marine, Ins. Co. v. Torpoco,* 879 S.W.2d 831, 835 (Tenn. 1994). They require different determinations. *Id.* The duty to defend is broader than the duty to indemnify. *Id.* The duty to defend is triggered by the "pleadings test," which requires a duty to defend if a complaint pleads facts that fall within a policy's coverage. *Id.* The duty to indemnify, on the other hand, is triggered only after a fact finder determines the "true facts" and these facts are within a policy's coverage. *Id.* As a result, the duty to defend is a question of law that can be decided at the summary judgment stage; by contrast, the duty to indemnify involves questions of fact that must be resolved by a fact finder after evidence is presented. *Id.* (holding a trial court's determination on the duty to indemnify was "not appropriate for summary judgment").

Here, AG did not have a duty to defend Norfolk until the Cincinnati policy's limits were exhausted, which did not occur until after the case was settled.[3] Accordingly, at issue then is whether AG owes a duty to indemnify Norfolk as an additional insured. Determining that issue turns on whether the accident was caused by East Coast's work, acts, or omissions. Under Tennessee law, that is a factual determination that cannot be resolved by summary judgment. As such, the issue of whether Norfolk is an additional insured must be reserved for a fact finding proceeding. Accordingly, Norfolk's Motion for Summary Judgment as to its status as an additional insured is **DENIED.**

---

**3.** Norfolk concedes this point. (Doc. 54 at 21)

### B. Extent of an Additional Insured's Coverage

▮ Although Norfolk's additional insured status cannot be determined at this time, it is important to resolve, prior to trial, the parties' dispute concerning the scope of coverage provided to an additional insured. Norfolk argues, as an additional insured, the policy covers Norfolk for its own negligence. (Doc. 76 at 8). AG disagrees and argues that if Norfolk is covered by the policy, its coverage is limited to its vicarious liability resulting from East Coast's negligence. (*See* Doc. 46 at 21–23). To support its assertion, AG points outside of the insurance policy to language found in the indemnification provision of the Vegetation Control Agreement, and Tennessee statutes and case law. Each of those extraneous sources will be addressed. We must first begin, however, with the policy language.

### i. Policy Language

The AI Endorsement covers an additional insured for liability, "but only with respect to 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in whole or in part, by" the named insured. (Doc. 1–4 at 62). This language undercuts AG's argument that the policy only covers Norfolk's vicarious liability. The phrase "caused, in whole or in part" denotes shared fault, and vicarious liability, on the other hand, "is an all or nothing proposition." *First Mercury Ins. Co. v. Shawmut Woodworking & Supply Inc.*, 48 F.Supp.3d 158, 173 (D. Conn. 2014), *aff'd*, 660 Fed. Appx. 30 (2d Cir. 2016). The AI Endorsement's use of the words "caused … in part" can only suggest that coverage extends beyond mere vicarious liability arising out of the named insured's acts or omissions. *See id.* Instead, the language covers the additional insured for its own negligence so long as the named insured was also a contributing cause of the injury or damage giving rise to liability. *See id.*

The phrase specifically denotes an intention to extend coverage to additional insureds for injuries and damage caused by "acts or omissions by both the named insured *and* the additional insured." *Pro Con, Inc. v. Interstate Fire & Cas. Co.*, 794 F.Supp.2d 242, 256–57 (D. Me. 2011) (emphasis in original).

The development of this standardized language supports this interpretation. The causation language was inserted in response to *McIntosh* and related cases, which, as discussed *supra*, interpreted the old "arising out of" language as extending coverage even when the additional insured was the sole cause of liability. *See First Mercury*, 48 F.Supp.3d at 173. The phrase "caused, in whole or in part, by" was intended to prevent coverage in such situations, and limit the additional insured's coverage to occurrences where the named insured was at least a partial cause. *See id.* However, it was not the ISO's intent to also limit coverage solely to vicarious liability caused wholly by the named insured's acts or omissions. *See id.* Indeed, additional insured endorsements similar to the one at issue here are often requested by contractors because courts find it covers an additional insured for its own negligence. *Plum Creek Marketing, Inc. v. Am. Econ. Ins. Co.*, 352 Mont. 56, 214 P.3d 1238, 1241 n. 1 (2009). If coverage was intended to extend only to vicarious liability, the phrase "caused, in part …" should not have been inserted into the policy. The Court cannot ignore or read out that phrase. *Capital City*, 788 F.3d at 380 ("[w]hile it is true that the additional insured is covered for its vicarious liability stemming from the named insured's operations, the insurer's attempt to limit coverage to that alone ignores the language of the additional insured endorsements." (quoting Turner, *Insurance Coverage of Construction Disputes* § 42:4)).

Further, the policy fails to specifically limit coverage to an additional insured's vicarious liability. "Had the parties intended to insure [the additional insured] for vicarious liability only, the policy could have easily referred to vicarious liability or specified whose negligence was covered and whose negligence was excluded from coverage." *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 617 (Tenn. Ct. App. 2011). Nothing prevented AG from specifically precluding an additional insured from receiving coverage for their own negligence. For example, in *BP Chem., Inc. v. First State Ins. Co.*, 226 F.3d 420, 425 (6th Cir. 2000), the insurance policy at issue provided coverage to an additional insured but excluded "ANY NEGLIGENT ACTS COMMITTED BY SUCH ADDITIONAL INSURED." The *BP Chem.* court correctly interpreted this language to exclude coverage for the additional insured's own negligence. *Id.* at 428. Here, there is no such language limiting coverage. The absence of specific language excluding coverage for an additional insured's own negligence, or limiting coverage to vicarious liability, signals that coverage extends to an additional insured's own negligent conduct so long as the named insured was also a partial cause. *See Capital City*, 788 F.3d at 380 (interpreting a similar additional insured endorsement) ("if the parties had intended coverage to be limited to vicarious liability, language clearly embodying that intention was available." (quoting *McIntosh*, 992 F.2d at 255)); *Thunder Basin*, 943 F.Supp.2d at 1014–15 (construing a similar additional insured endorsement) ("Furthermore, the policy does not contain any specific mention of vicarious liability as a limitation on coverage, and such a restriction could have been written into the policy if the parties had intended to limit coverage in that way."); *Am. Empire Surplus Lines Ins. Co. v. Crum & Forster Specialty Ins. Co.*, 2006 WL 1441854, at *7 (S.D. Tex. May 23, 2006) ("The words 'de-

rivative' and 'vicarious' are conspicuously absent from the Endorsement. [The insurer] was free to draft an endorsement that specifically limited additional insured coverage to situations which the additional insured was liable on only a vicarious liability theory. However, [the insurer] did not do so. Thus, [the insurer] may not read into the clause an unstated limitation ...").

### ii. The Vegetation Contract

Instead of focusing on the plain language of the policy, AG argues that the AI Endorsement should be interpreted in the context of what the parties intended, as reflected by the Vegetation Control Agreement. (Doc. 46 at 22). There are two provisions in the Vegetation Control Agreement to which AG points to support its various arguments. Each will be discussed in turn, but the primary provision AG relies on is the Vegetation Agreement's indemnity provision. The indemnity provision of the Vegetation Agreement provides as follows:

5.1. Indemnification

[East Coast] shall indemnify and hold harmless the Indemnified Parties from and against any and all liability, damages, claims, suits, judgments, costs and expenses (including, but not limited to, litigation costs, investigations costs, reasonably attorney fees, ... arising from or in connection with:

. . .

(a)(iii) ... any alleged loss of life of or personal injury to any person or the loss of or damage to any property arising from, incident to or in connection with the negligent acts or omissions or willful misconduct of Contractor; except to the extent that the property loss or damage or personal injury or death was caused by the negligence or intentional misconduct of [Norfolk].

(Doc. 1–2 at 12). AG asserts because the Vegetation Agreement's indemnification provision does not require East Coast to

indemnify Norfolk for liability "caused by the negligence ..." of Norfolk, AG likewise should not be required to indemnify Norfolk for its own negligence. AG argues the indemnification provision should be kept in mind when reading AG's insurance policy. To support this proposition, AG cites *Georgia–Pacific · LLC v. Swift Transp. Corp.*, 2008 ·WL 4380885 (Tenn. Ct. App. Sept. 29, 2008). However, *Swift's* facts are particular to that case and distinguishable from this case.

. In *Swift*, a carrier company, Swift, entered into . a business agreement with Georgia–Pacific ("GP"). 2008 WL 4380885, at *1. In the agreement Swift promised to indemnify GP for any liability arising out of Swift's operations, but indemnification was not extended to claims "caused by an act or omission of.[GP]." *Id.* The contract also required Swift to obtain CGL insurance that listed GP as an additional insured. *Id.* at *2. Swift initially purchased such a CGL policy but later let coverage lapse in favor of self-insuring. *Id.* Sometime after this, one of Swift's employees was at a GP truck terminal. *Id.* The Swift employee fell in a stairway at the GP facility and subsequently brought a claim against GP for negligence. *Id.* Pursuant to the contract, GP requested indemnification and defense from Swift, which Swift refused. *Id.* After settling the case with Swift's employee, GP brought a declaratory action against Swift seeking indemnification. *Id.* Swift claimed it had no obligation to indemnify GP because the incident was caused by GP's act or omis-

sion, which the indemnification agreement precluded. *Id.* at *3. GP argued because Swift was self-insured for commercial liability and the contract required Swift to cover GP as an additional insured in a CGL policy, GP was entitled to indemnification under the insurance requirement of the contract. *See id.* at *3. The Tennessee Court of Appeals, applying Georgia law, disagreed. *Id.* at *5. The court found that, although CGL policies can cover an additional insured for their own negligence, nothing in the contract between GP and Swift required Swift to specifically obtain such a policy if insured. *Id.* at 6. Without an insurance policy to interpret, the court found the indemnification agreement, which precluded indemnity, controlled the parties' respective rights and obligations, and that Swift's obligations could not be expanded by the insurance requirement. *See id.*

Here, in contrast to *Swift*, there is an insurance policy for the Court to interpret when determining the parties' rights. Further, Norfolk's claim against AG is not as a contractee seeking indemnification from a contractor, as was the case in *Swift*. Instead, Norfolk is seeking indemnification as an additional insured under AG's insurance policy.

Norfolk's rights under AG's policy cannot be limited by a separate, albeit related, contract to which AG is not a party. The Vegetation Control Agreement determines the rights and obligations that exist between East Coast and Norfolk, not AG's rights and obligations to Norfolk.[4] If AG

---

4. To support its assertion that the Vegetation Control Agreement should be considered in conjunction with the insurance policy, AG also cites *Liberty Surplus v. Norfolk*, 2016 WL 3149716 (M.D. Ga. Jun. 3 2016), *aff'd*, 684 ·Fed.Appx. 788 (11th Cir. 2017). There the court looked to a train crossing contract to determine what particular crossings the named insured had agreed to insure Norfolk for. *Id.* at *3. The court also found there to be no coverage for Norfolk's own negligence, but

made that determination by looking solely to the policy. *Id.* The Court finds that this case would be relevant if there were a dispute about whether East Coast agreed to make Norfolk an additional insured as to the Mountain View Crossing. Then the AI Endorsement would call the Court back to the written agreement to determine whether the crossing was covered by the policy. However, there is no such dispute here, and the policy does not

wanted to receive the benefit of East Coast's bargained for limited indemnity obligations, it could have done so by referencing that arrangement in its policy. Indeed, such policy language was readily available to AG at the time its policy was enacted. In 2013, the ISO drafted boilerplate language that specifically limits an additional insured coverage to the extent of the named insured's indemnity obligations. The language provides in part:

> 2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which [the named insured is] required by the contract or agreement to provide for such additional insured.

ISO, CG 20 37 04 13, § A §§ 2. AG could have easily been inserted this language into its policy if it so wished, but it did not. The Court may not refashion the policy to include such an exclusion, nor may it imply one. *See Miller v. Am. Cas. Co. of Reading Pa.*, 377 F.2d 479, 480 (6th Cir. 1967) (per curiam) (applying Tennessee insurance law) ("We see no mandate in law or public policy for this court to imply such an exclusion when none such was agreed on by the parties when the insurance contract was signed.").

In another argument, AG references the Vegetation Control Agreement's insurance provision to claim that the agreed policy limit of East Coast's insurance coverage for Norfolk had a combined cap at $2 Million. (Doc. 86 at 4). The referenced language required East Coast to purchase "Commercial General Liability Insurance with a combined single limit of not less than Two Million Dollars ($2,000,000) per occurrence." As an initial matter, a plain reading of the provision simply requires a policy limit floor, not a ceiling; that is to say, it requires a minimum $2 million policy limit, not a maximum limit of that amount. However, AG's argument likewise fails because if it wanted to limit an additional insured's coverage to the *minimum* policy limit required by the agreement, it could have.[5] Again, in 2013, the ISO drafted such policy language. That drafted provision read, "the most we will pay on behalf of the additional insured is the amount of insurance: 1. *Required* by the contract or agreement . . ." ISO, CG 20 37 04 13, § B (emphasis added). AG could have likewise adopted this language and inserted it in its policy, but again it did not. Accordingly, the Court rejects AG's invitation to rewrite its policy to limit coverage in such a manner.

### iii. Tennessee Public Policy and Law

Whether an additional insured is covered for its own negligence is not a new or novel question under Tennessee law. The Tennessee Court of Appeals has addressed this issue. *See Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606 (Tenn. Ct. App. 2011). In *Lancaster*, a paving company (Ferrell) hired a contractor to provide security at its warehouse. *Id.* at 609. One night the contractor's security guard was shot by intruders. *Id.* Prior to this shooting, the security contractor orally agreed to obtain CGL insurance and make Ferrell an additional insured. *Id.* The wounded security

---

call back to the written agreement to determine the *scope* of an additional insured's coverage.

**5.** AG cites the AI Endorsement which holds "[t]he limits applicable to the additional insured are those specified in the written contract or agreement . . ." (Doc. 1–4 at 62–63). The provision further states, "[i]f no limits are specified in the written contract or agreement, the limits applicable to the additional insured are those specified in the Declarations of this Coverage." Because the Vegetation Control Agreement does not contain an upward limit, the written agreement does not have a specified cap and the policy's general limits apply.

guard brought a negligence action against Ferrell, and Ferrell requested the security company's CGL insurer tender it a defense as an additional insured. *Id.* After refusing to defend Ferrell, the insurer brought a declaratory judgment action. *Id.* The Tennessee Court of Appeals quickly determined that Ferrell was an additional insured under the policy. *Id.* at 613. The remaining issue was whether Ferrell, as an additional insured, was covered under the policy for its own negligence. *Id.* In deciding the issue, the *Lancaster* court focused solely on the insurance policy language, "rather than accepting Insurer's characterization of the purpose of such provisions." *Id.* at 614. The court, interpreting an older ISO policy utilizing the "arising out of" language, held a common sense reading of the language provided coverage for Ferrell's own negligence. *Id.* at 617. The court was influenced by not only the plain language of the policy, but also the overwhelming majority of courts that reached the same conclusion. *Id.* Based on *Lancaster*, the Court concludes that it is likely the Tennessee Supreme Court would reach the same conclusion under this policy and these facts.

AG relies on cases in which courts have held contractual indemnification provisions do not indemnify an indemnitee for its own negligence unless the provision's language does so clearly in unambiguous terms. (Doc. 46 at 23–24). The reasoning of the cases is that indemnifying a party for its own negligence shifts an "extraordinary risk" to the indemnitor, and that "such agreements must be regarded as exceptional rather than usual in the majority of business transactions." *Phoenix v. Gainer*, 2008 WL 5330493, at *7 (Tenn. Ct. App. Dec. 19, 2008) (discussing an indemnity provision in a lease agreement). These cases, however, apply to ancillary indemnity provisions in a contract. A single indemnity provision—buried in multipage contract, pertaining to something other than

indemnification—has to be unequivocal to put parties on notice. Insurance contracts, on the other hand, are much different. The *sine qua non* of an insurance contract is the insurer's assumption of the insured's risk. Unlike indemnity provisions in a contract, if an insurance policy contains equivocal language, coverage is not defeated. Instead, the ambiguities are construed against the insurer. *Tata*, 848 S.W.2d at 650. Further, nothing in the AI Endorsement is unclear. The AI Endorsement extended "insured" status to any "person or organization" East Coast agreed to designate as an additional insured, and it provided an additional insured coverage for any injury and damage caused, "in part," by East Coast's acts or omissions. (Doc. 1–2, at 13). The overwhelming majority of courts interpreting this language have come to the same conclusion; such endorsements cover additional insureds for their own negligence.

AG further asserts a Tennessee statute prohibits Norfolk from receiving indemnification for its own negligence. (Doc. 75 at 12). The full text of the cited statute is as follows:

> A covenant promise, agreement or understanding in or in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of a building, structure, appurtenance and appliance, including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, the promisee's agents or employees or indemnitee, is against public policy and is void and unenforceable.

Tenn. Code Ann. § 62–6–123. AG cites a nearly one-hundred-year-old Minnesota case to claim that the statute's language

applies to the maintenance of railroad crossings. (*See* Doc. 75 at 12). If the statute is applicable as AG asserts, it prohibits, as violating public policy, an indemnitee engaged in the applicable activities from receiving indemnity for its "sole negligence." *Id.* The Court does not follow AG's argument. First, the statute has been exclusively applied to construction-related contracts. *See Elliott Crane Serv., Inc. v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376, 379 (Tenn. 1992) (citing the statue's enacting title, "An Act declaring the invalidity of certain indemnity or hold harmless agreements in the *construction* industry," (emphasis added) as clear evidence of the legislature's intent concerning the law's scope); *see also Posey v. Union Carbide Corp.*, 507 F.Supp. 39, 41 (1980) (holding an older codification of the statute, "clearly abolishes indemnity agreements in *construction* contracts." (emphasis added)); *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 174 (Tenn. Ct. App. 2001), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016) ("cases that upheld the application of the statute ... involved in some aspect of a construction project."); *Carroum v. Dover Elevator Co.*, 806 S.W.2d 777, 780 (Tenn. Ct. App. 1990) ("Looking at the natural and ordinary meaning of this statute, we interpret it to include any agreement relative to the construction of a building."). Further, if the statute applied to insurance contracts, such as the AG policy here, it would result in outlawing the insurance industry in the sectors covered by the § 61–6–123. In effect, if its argument is to be believed, AG is essentially admitting it has conducted—and likely conducts—some of its insurance business in violation of Tennessee public policy. However, AG has not cited to, nor can the Court find, cases in which Tennessee courts have applied § 62–6–123 to void an insurance contract. Additionally, Tennessee courts continue to enforce insur-ance policies in sectors clearly covered by § 62–6–123. *See, e.g., Travelers Indem. Co. of Am. v. Moore & Assoc., Inc.*, 216 S.W.3d 302 (Tenn. 2007) (enforcing a construction company's CGL insurance policy). Based on the foregoing reasons, the Court finds § 62–6–123 does not apply to railroad crossings or insurance contracts. As such, it is inapplicable to whether Norfolk can be indemnified for its own negligence under AG's policy.

### iv. Conclusion

After reviewing the insurance policy and Tennessee law, the Court finds an additional insured is covered for its own negligence under AG's policy. However, because additional insured status is only triggered if East Coast was a partial cause of the injury or damage creating liability, it cannot be determined at this time whether Norfolk is entitled to the benefits of an additional insured.

### C. Judicial Estoppel

■ AG argues Norfolk should be estopped from asserting East Coast partially caused the Mountain View Crossing accident. (Doc. 46 at 15–17). In the Crass–Gallagher suit, Norfolk's attorney and employees made statements denying overgrown vegetation contributed to the accident. (*Id.*). For example, Norfolk employee Steve Driskell's statement under oath indicated the vegetation did not play a role in causing the train collision. Citing these statements, AG argues Norfolk cannot reverse course and take a different position, and urges this Court to apply judicial estoppel to preclude Norfolk from taking such contradictory positions. To support its position, AG relies on Tennessee's law on judicial estoppel. However, AG relies on the incorrect law. Under Sixth Circuit precedent, federal law controls the application of judicial estoppel in a diversity action. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 n. 4 (6th Cir. 1982).

 Judicial estoppel is an equitable doctrine created to protect judicial integrity. *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Instead of allowing parties to improperly "play[ ] fast and loose" with the judicial process, the doctrine of judicial estoppel steps in to preserve judicial integrity by preventing parties from intentionally "changing positions according to the exigencies of the moment." *Id.* (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). While defining the circumstances under which judicial estoppel is properly invoked is "probably not reducible to any general formulation of principle," the courts have consistently identified several factors that can inform a court's decision. *Id.* (quoting *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982)). First, a party's subsequent position must be "clearly inconsistent" with its earlier position. *Id.* Second, the party's prior position was actually successful in persuading the prior court, "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled." *Id.* (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)) (internal quotation marks omitted). Finally, the party asserting the inconsistent position would obtain an unfair advantage over the opposing party if not estopped. *Id.* at 751, 121 S.Ct. 1808.

 After considering these factors, it is apparent judicial estoppel is not appropriate here. Norfolk's prior position was not successfully asserted in the Crass–Gallagher suit. This fact is fatal to AG's argument. Judicial estoppel may not be applied unless the previous court accepted the prior inconsistent position. *Edwards*, 690 F.2d at 599. Since the prior lawsuit settled, the Tennessee trial court did not accept Norfolk's position about the overgrown vegetation's role in the accident. A position is not accepted by a court if the proceeding in which it is raised is settled. *Id.* ("a settlement neither requires nor implies any judicial endorsement of either parties claims or theories, and thus, a settlement does not provide the prior success necessary for judicial estoppel." (quoting *City of Kingsport v. Steel & Roof Structures, Inc.*, 500 F.2d 617, 620 (6th Cir. 1974))).

Because its prior position was not successfully asserted, the Court is not permitted to invoke the equitable doctrine of judicial estoppel against Norfolk. Accordingly, AG's Motion for Summary Judgment as to judicial estoppel is **DENIED**.

### D. Notice Requirement

 AG's policy requires a named insured to notify AG "as soon as practicable of an occurrence which may result in damages covered" by the policy.[6] (Doc. 1–3

---

**6.** Both AG's policy and the Cincinnati policy contain a notice requirement. (Doc. 1–3 at 28–29; Doc. 1–4 at 10–11). The AG policy holds if its conditions conflict with a condition of the underlying policy, AG's policy condition controls. (Doc. 1–3 at 11). As such, AG's notice requirement controls, and it holds "*you* must see to it we are notified." (*Id.* at 28) (emphasis added). "You" is not defined in either policy. However, in the AI Endorsement in Cincinnati's policy it describes an additional insured as "any person or organization when *you* and *such person* ... agreed in writing to add as an additional insured." (Doc. 1–4 at 62) (emphasis added). The description's distinction between "you" and "such person" suggests that the term "you" does not include an additional insured. As such, AG's policy requires a named insured, not an additional insured, to notify AG when it becomes aware of facts that might lead to claims under the policy. Norfolk claims East Coast's President became aware of the Mountain View Crossing accident the night it occurred. (Doc. 76 at 20).

at 28–29). Such conditions have been interpreted to require the insured provide notice when he or she is or should be aware of facts that would lead a reasonably prudent person to expect an adverse claim. *Reliance Ins. Co. v. Athena Cablevision Corp.*, 560 S.W.2d 617, 618 (Tenn. 1977). Further, the phrase "as soon as practicable" is not a precise, scientific phrase; instead the words are "roomy" and there is "free play" in their joints. *Id.* (quoting *Young v. Travelers Ins. Co.*, 119 F.2d 877 (5th Cir. 1941)). However, a delay of more than a year is clearly not "as soon as practicable" and is considered late. *Griffith Motors, Inc. v. Compass Ins. Co.*, 676 S.W.2d 555, 558 (Tenn. Ct. App. 1983) (holding insured's notice was late when it was made nine months after discovering facts). Under Tennessee law, late notice is not sufficient, standing alone, to defeat coverage. *Alcazar v. Hayes*, 982 S.W.2d 845, 853 (Tenn. 1998). Instead, coverage is only forfeited if an insurer was prejudiced by late notice. *Id.* Nonetheless, late notice creates a presumption of prejudice, which the insured bears the burden of rebutting. *Id.* at 856.

The parties disagree on the exact date AG received proper notice of the incident. First, Norfolk claims East Coast's agent gave AG and Cincinnati notice on July 31, 2015. (Doc. 54 at 10). Although East Coast provided it, if the notice occurred, it would have been valid notice as to Norfolk. Once a named insured has given an insurer notice, there is no need for an additional insured to likewise give second notice. *Transamerica*

*Ins. Co. v. Parrot*, 531 S.W.2d 306, 314 (Tenn. Ct. App. 1975) (holding second notice by an additional insured would be "supererogatory"); *see also supra* n. 5. Norfolk claims it gave AG notice by letter on September 11, 2015. (Doc. 54 at 11). However, AG argues this letter was not sufficient notice because it was misaddressed.[7] (Doc. 46 at 3 n. 12). According to AG, the earliest it received notice was on October 30, 2015. (*Id.* at 3). AG makes this claim despite Norfolk submitting letters into the record that, if true, show AG was in contact with East Coast about the Mountain View Accident as early as August 3, 2015. (*See* Doc. 54 at 10).

Whether received on July 31st or October 30th, notice was late. Any notice within that timeframe was well over a year after the train accident, and, at the very least, Norfolk was aware of the accident shortly after it occurred. As such, AG was owed notice, and notice was late if given within the disputed timeframe. However, the exact notice date is relevant to the degree late notice prejudiced AG. For instance, notice on July 31st would have given AG over three months to assess the Crass-Gallagher complaint and discovery to determine coverage under the policy. On the other hand, an October 30th notice would have given AG mere weeks to sift through discovery before the November mediation. As a result, the unresolved dispute regarding the exact notice date is a genuine issue of material fact precluding summary judgment.

*Hayes*, 982 S.W.2d 845, 852 (Tenn. 1998). The notice requirement simply requires an insurer have notice of an incident so it can begin its work in determining whether there is coverage and an obligation to defend. The notice requirement is not an escape hatch designed to deny coverage as a result of a harmless defect in the insured's notice.

---

7. It is unclear from AGs motion whether it actually received the letter despite it being misaddressed. Norfolk claims AG has already admitted that it actually received the letter (Doc. 14 at 11 n. 59). If AG actually received the letter, it would have put AG on notice. It is contrary to Tennessee's public policy to allow an insurer to avoid "its contractual duties" because of a "technicality." *Alcazar v.*

Because it is presumed AG was prejudiced by the late notice, Norfolk bears the burden to overcome the presumption of prejudice. *Alcazar*, 982 S.W.2d at 856. In *Alcazar*, the Tennessee Supreme Court listed several, *"non-exclusive"* factors to consider when weighing whether an insured was prejudiced. *Id.* (emphasis in original). Those factors are:

> (1) the availability of witnesses to the accident; (2) the ability to discover other information regarding the conditions of the locale where the accident occurred; (3) any physical changes in the location of the accident during the period of the delay; (4) the existence of official reports concerning the occurrence; (5) the preparation and preservation of demonstrative and illustrative evidence, such as the vehicles involved in the occurrence; or photographs and diagrams of the scene; (6) the ability of experts to reconstruct the scene and the occurrence; and so on.

*Id.* (quoting *Great Am. Ins. Co. v. C.G. Tate Const. Co.*, 303 N.C. 387, 279 S.E.2d 769, 776 (1981)). The factors are clearly concerned with an insurer's ability to investigate an occurrence. Here, AG's ability to independently investigate the accident and make a coverage determination was clearly impaired by late notice. By the time AG was aware of the accident, over a year had passed, and the scene of the accident had been altered. It is true that Norfolk promptly conducted its own investigation of the accident, and typically when an insured defends itself it can be assumed any reasonable defense will involve a thorough investigation of the incident, which will likely be recorded and made available to an insurer for subsequent review. However, even with a record to review, the question of prejudice when an insured controls its own defense ultimately boils down to whether the insured's defense and investigation were tainted, either consciously or subconsciously, by moral hazard absent

an insurer's watchful eye. That concern is heightened in complex situations such as this one, where there are multiple concerned parties with potentially conflicting interests. Under these circumstances, "competent evidence" capable of rebutting prejudice will likely involve showing there exists ample objective and empirical evidence that is susceptible to subsequent independent analysis by an insurer. *Id.* Further, the insurer must have had sufficient time to review such evidence before having to make an informed decision regarding coverage, including whether to consent to a settlement proposal.

Ultimately, this is an inquiry that is dependent on facts, many of which are in dispute. The parties dispute the adequacy of the record itself, whether the record was sufficiently delivered to AG prior to the Crass–Gallagher mediation, whether AG took an active enough role in requesting information, and they disagree about how much time AG had to assess the situation. (*Compare* Doc. 46 at 15 to Doc. 54 at 22–23). All of these are material facts relevant to prejudice, and none of them can be resolved without a factual determination. As such, this inquiry cannot be determined by summary judgment. Accordingly, AG's and Norfolk's Motion for Summary Judgment as to whether AG was prejudiced by late notice is **DENIED.**

### E. Consent Requirement

AG claims Norfolk forfeited coverage under the policy because it failed to receive AG's permission to settle claims resulting from the Mount View Crossing accident. Both the Cincinnati and AG policies contain provisions that require an insured receive the insurer's permission before making settling a case or making voluntary payments, respectively. (Doc. 1–3 at 29; Doc. 1–4 at 53). Such consent requirements are strictly enforced as written, even if the result seems "harsh and

unjust." *State Auto. Ins. Co. v. Lashlee–Rich, Inc.*, 1997 WL 781896, at *7 (Tenn. Ct. App. Dec. 22, 1997). When an insured makes a payment or incurs an expense as a result of an occurrence, the insured cannot subsequently recover such costs if made without the insurer's knowledge or consent. *See Anderson v. Dudley L. Moore Ins. Co.*, 640 S.W.2d 556, 560 (Tenn. Ct. App. 1982) (holding insured violated consent requirement when he did not make a formal request for coverage and made voluntary payments without insurer's permission, even though insurer was aware of the occurrence); *see also Lashlee–Rich*, at *4 (holding insured violated consent requirement by repairing damage it caused to a client's facility without insurer's knowledge). Unlike with a notice requirement, whether an insurer was prejudiced by an insured's failure to receive consent is irrelevant. *See Gatson v. Tennessee Farmer Mut. Ins. Co.*, 120 S.W.3d 815, 820 (Tenn. 2003). However, an insurer can impliedly waive the consent requirement if it fails to take affirmative steps to reserve that condition. If an insurer receives formal notice of an occurrence and has knowledge of a potential settlement, the consent requirement will be deemed waived if the insurer fails to remind the insured of the condition. *See id.*; *see also Rutherford v. Tennessee Farmers Mut. Ins. Co.*, 608 S.W.2d 843, 846 (Tenn. 1980) (holding an insurer cannot rely on the consent requirement if it is aware of an insured's intent to negotiate a settlement and fails to warn).

#### i. Drummond Settlement

■■■ Norfolk settled the Drummond claim in August 2014, mere months after the Mount View Crossing Accident. When it did so, AG was not aware of the accident or the Drummond claim. Norfolk asserts it is not seeking indemnity for the Drummond settlement, and claims arguments involving that settlement are irrelevant and being used by AG as a red herring.

(Doc. 84 at 4). However, AG has asked the Court to declare its rights and hold that it is not responsible for indemnifying Norfolk for the Drummond settlement. (Doc. 46 at 25).

Because the Drummond settlement occurred so early on and without AG's knowledge, much less its consent, Norfolk cannot receive indemnification as an additional insured for the Drummond settlement. On this issue, the Court finds the *Lashlee–Rich* decision instructive. 1997 WL 781896 (Tenn. Ct. App. Dec. 22, 1997). In *Lashlee–Rich*, an insured was constructing a drainage ditch when it damaged an electrical pipe with a jackhammer. *Id.* at *1. Because the damage cut off power to essential components of a production facility, the insured immediately made arrangements to have the electric line repaired. *Id.* The next day, the insured formally notified the insurer of the incident. *Id.* When the bill for the repairs came due, the insured sent it along to the insurer for indemnification. *Id.* In refusing to pay the cost of the repairs, the insurer claimed, among other things, that it was not obliged to indemnify the insured for the cost because the repairs were made without the insurer's permission. *Id.* at *2. The Tennessee Court of Appeals agreed and affirmed judgment in favor of the insurer. *Id.* at *7.

Here, like in *Lashlee–Rich*, Norfolk settled the Drummond claim without AG's notice or consent. As a result, Norfolk did so in clear violation of the consent provision. Norfolk cannot now seek indemnification as an additional insured for the amount. Accordingly, AG's Motion for Summary Judgment as to the Drummond settlement is **GRANTED**.

#### ii. Crass–Gallagher Settlement

■■■ Unlike the Drummond settlement, the Crass–Gallagher settlement was made after AG was notified about the ac-

cident and claim. Additionally, AG was aware of the mediation that led to the Crass–Gallagher settlement. As a result of this knowledge, Norfolk claims AG waived the consent requirement as to the Crass–Gallagher settlement because it failed to warn Norfolk of the consent requirement before the mediation. Because it was aware of the mediation, AG could have requested to attend the mediation, object to it, or at least warn Norfolk that any settlement would require its consent. Instead, AG only instructed Norfolk to "act as a reasonable uninsured." As a result, AG effectively waived the consent requirement as to the Crass–Gallagher settlement.

The mediation between the Norfolk companies, its employees (also defendants in the suit), and the three Crass–Gallagher plaintiffs was already a complicated affair absent AG's attendance. The number of parties in a mediation inevitably increases transaction costs involved in reaching a settlement agreement. Transaction costs are exponentially increased by the inclusion of a liability insurer that demands an insured operate with their consent. Such friction can be reduced when an insurer conducts or funds the insured's defense. Here, however, there were two implicated insurers, Cincinnati and AG, neither of whom were actively defending Norfolk. An insurer's inclusion in dispute resolution strains public policy, which prefers parties efficiently resolve differences and tort victims receive swift compensation for their losses. However, public policy has to be balanced against the bargained for rights of insurers, who have a legitimate interest in ensuring moral hazard does not contaminate settlement negotiations. Nevertheless, an insurer's rights are not unlimited. An insurer can and should reduce the transaction costs involved in a settlement by being clear about its intentions. If an insurer instead sits on the sidelines and does not insist on its rights, it introduces uncertainty into negotiations and puts the defendant in a precarious position.

Tennessee courts require insurers be alert and invoke their rights before they are compromised by a conflicting action, instead of relying on them as an "afterthought." *Rutherford*, 608 S.W.2d at 846. The Tennessee Supreme Court's *Rutherford* decision, which presented facts somewhat similar to the present case, is instructive. *See id.* In *Rutherford*, an uninsured motorist insurer "knew [insured] and her counsel were actively engaged in negotiations with the responsible tortfeasor." *Id.* at 844. Yet the insurer did not advise her of any "policy provisions, exceptions or exclusions which *it deemed pertinent*, nor did [insurer] in any way object to the pursuit of the third-party claim by [insured] ..." *Id.* (emphasis added). As a result, the *Rutherford* court agreed with the trial court's entry of judgment holding the insurer had impliedly waived the consent requirement. *Id.* at 843.

Here, other than a blanket reservation of "[a]ll" of its rights, AG made no specific invocation of the consent requirement prior to mediation. (Doc. 56–44 at 2). Its post settlement reliance on the consent requirement "was an afterthought which was never once revealed to the insured ... until long after the ... settlement had been effected ..." *Id.* at 846. AG avers, as it stated in its letter, nothing in its pre-mediation "letter should be construed as a waiver." (Doc. 75 at 24). Assuming such boilerplate language is even effective under these circumstances, it was not the language in the letter that affirmatively waived the consent requirement; rather, the requirement was impliedly waived by AG's inaction in allowing mediation to proceed without invoking its rights or objecting to the mediation. At any time prior to the mediation, AG could have reserved its rights by signaling to Norfolk that it in-

tended to rely on the consent requirement. It did not do so.

AG further argues that a valid waiver requires an intentional relinquishment of a "known right." (Doc. 46 at 11). Putting aside the long standing principle of contract law that holds a party to a contract is presumed to have knowledge of the contract's contents *Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 156–57 (Tenn. Ct. App. 1993), AG confuses implied waiver with an affirmative waiver. *See Kentucky Nat. Ins. Co. v. Gardner*, 6 S.W.3d 493, 500–01 (Tenn. Ct. App. 1999) (explaining the distinction between an implied waiver and an affirmative waiver). An affirmative waiver *is* the intentional relinquishment of a known right. *Id.* An implied waiver, on the other hand, results when an insurer's conduct is "clearly inconsistent with an intention to insist upon strict compliance with the provision at issue." *Id.* at 499. As to the extent AG claims that prior to the mediation it was unsure whether Norfolk was an insured, a reasonably prudent insurer would have specifically invoked its rights in order to preserve them in case Norfolk turned out to be an insured. AG certainly was not unfamiliar with this concept. It did attempt to reserve "[a]ll" of the rights, but the lack of specificity was not sufficient to reasonably put Norfolk on notice that AG would strictly rely on the consent requirement. This conclusion is reinforced by Norfolk's assertion that AG would not provide copies of, and Norfolk could not otherwise obtain, the AG policy prior to the mediation. (Doc. 54 at 13). While the Court does not rest its conclusion on that assertion, if true, Norfolk would have been operating blindly without even inquiry notice of the consent requirement; under such circumstances, Norfolk could not have been reasonably expected to take the consent requirement into consideration.

As such, the record clearly indicates AG waived the consent requirement by not specifically invoking that right or objecting to mediation. Accordingly, Norfolk's Motion for Summary Judgment as to AG's waiver of the consent requirement to the Crass–Gallagher settlement is **GRANTED.**

**F. Bad Faith**

Norfolk asserts AG acted in bad faith. Tennessee's bad faith statute holds as follows:

(a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56–7–105. In order for an insured to recover for an insurer's bad faith, the insured has to show: "(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been

made, (3) the insured must have waiting 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days, and (4) the refusal to pay must have not been in good faith." *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 270 (Tenn. Ct. App. 2013). The second element is clearly established by the record, and the third element is irrelevant because AG, not Norfolk, initiated this action. At issue is whether the policy was due and payable and whether AG's delay or denial was in bad faith. The Court will address each in turn.

### i. Due and Payable Element

▮ AG claims that a bad faith action is improper because its policy had not become due and payable at the time Norfolk sent its demand letter. (Doc. 46 at 19). AG further argues that coverage under its policy was not payable until or unless the policy limits of the underlying Cincinnati policy had been exhausted. (*Id.*). Norfolk asserts AG misconstrues its policy to make its case, and claims coverage under the policy was due after Cincinnati became legally obligated to pay. (Doc. 76 at 22–23).

Determining when AG's policy was triggered is a straightforward matter of contract interpretation. AG's policy, under the conditions section, contains a subsection governing "When Loss is Payable." (Doc. 1–3 at 28). The subsection's relevant language is as follows:

> Coverage under this policy will not apply until the Insured, or the Insured's underlying insurer has paid or is legally obligated to pay the full amount of the Underlying Limits of Insurance or Retrained Limit.

(*Id.*). The policy language clearly makes coverage due upon the insured or the underlying insurer paying or becoming legally obligated to pay. There are four circumstances in which AG policy would have come due: (1) Norfolk, as an insured under the policy, became legally obligated to

pay an amount that exceeded the limits of the underlying coverage; (2) Norfolk paid an amount that exceeded the policy limits of the underlying coverage; (3) Cincinnati, as the underlying insurer, became legally obligated to pay the full amount of its limits under the policy; or (4) Cincinnati paid an amount up to its policy limits. AG claims only the fourth scenario was applicable and that it had not occurred when Norfolk made its demand. However, a plain reading of the policy does not support AG's assertion. Any one of the four scenarios would have been sufficient to trigger coverage under AG's policy, and at the very least two of the four had occurred when Norfolk made its demand. As such, the AG policy was triggered at the time of Norfolk's demand.

### ii. Lack of Good Faith Element

▮ It is clear, and the parties do not dispute, that Norfolk sent AG a bad faith demand letter on December 22, 2015. This demand letter triggered a 60–day statutory window during which AG was required to make a coverage decision. It is not apparent from the record whether AG specifically denied coverage 60 days after Norfolk's formal demand. Although the statute does not explicitly reference to such delays, it is obvious bad faith actions can lie for delays in coverage decisions if not made within the 60–day window. *See id.*; *see also Thompson v. Interstate Life and Accident Co.*, 128 Tenn. 526, 162 S.W. 39, 39 (1913) ("Sixty days is the extreme limit allowed by the Legislature in which the [insurer] can investigate the question of its liability, and, if it fails to respond to the demand for payment within that time, the suit may be commenced without proof of a refusal"). Whichever is the case, not every delay or coverage denial constitutes bad faith. *See Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986). Coverage denials are not

bad faith if they are based on substantial legal grounds. *See Stooksbury v. Am. Nat. Prop. & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2003). Likewise, delays do not constitute bad faith when "there is a genuine dispute as to value, no conscious indifference to the claim, and no proof that the insurer acted from 'any improper motive.'" *Palmer*, 723 S.W.2d at 126 (quoting *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 556 S.W.2d 750, 752 (Tenn. 1977)).

 Here, Norfolk admits after its demand, AG attempted to work with Norfolk in determining whether coverage existed under the policy. (Doc. 54 at 14). AG requested documents and apparently remained in contact with Norfolk during the 60–day window and beyond. (*Id.*). It appears AG's reluctance to extend coverage arises from a "genuine" disagreement regarding coverage, and prior to its suit AG was not obviously operating under "conscious indifference" to Norfolk's claim. *Palmer*, 723 S.W.2d at 126. However, the fact AG was unable to make a determination within the statutorily provided 60–day window is sufficient to make a prima facie showing of bad faith capable of overcoming summary judgment. Additionally, as to whether AG was operating under "improper motives," it is apparent the issue introduces a factual question that should be resolved after a fact finding determination. *See Mason v. Tennessee Farmers Mut. Ins. Co.*, 640 S.W.2d 561, 567 (Tenn. Ct. App. 1982). It should be noted it is not sufficient to show an insurer was acting with an improper motive, but an insured also has to show, as a result of the delay or denial, it incurred "additional expense, loss, or injury." *See* Tenn. Code Ann. § 56–7–105. Norfolk should be prepared to show both if it expects to receive damages under bad faith. Accordingly, AG's Motion for Summary Judgment as to the bad faith issue is **DENIED.**

### G. Coverage B—Umbrella Policy

 AG's policy contained two types of coverages: Coverage A, which is an excess follow form policy, and Coverage B, which is an umbrella policy. AG requests this Court declare Coverage B inapplicable to Norfolk under these facts. Coverage A and Coverage B are mutually exclusive coverages. Coverage B does not apply when "insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the Limits of Insurance of the underlying insurance." (Doc. 1–3 at 11). AG's Coverage B, as umbrella coverage, only steps in when the underlying policy fails to provide coverage. As such, Coverage B is inapplicable under these facts because Cincinnati's payment precludes recovery under that policy. Accordingly, AG's Motion for Summary Judgment as to Coverage B is **GRANTED.**

### III. CONCLUSION

For the reasons stated herein

- Norfolk's Motion for Summary Judgment as to its status as an additional insured and breach of contract claim is **DENIED;**

- Plaintiff's Motion for Summary Judgment as to judicial estoppel is **DENIED;**

- Both Norfolk's and Plaintiff's Motion for Summary Judgment as to the policy's notice requirement and whether AG was prejudiced by late notice is **DENIED;**

- Plaintiff's Motion for Summary Judgment as to whether it owes a duty to indemnify for the Drummond Settlement is **GRANTED;**

- Norfolk's Motion for Summary Judgment as to whether AG waived the consent requirement as to the

Crass–Gallaher. Settlement is **GRANTED;**

- Plaintiff's Motion for Summary Judgment as to the bad faith claim is **DENIED;** and
- Plaintiff's Motion for Summary Judgment as to the Coverage B issue is **GRANTED.**

At trial, Norfolk will bear the burden of establishing it is an additional insured under the policy by showing by a preponderance of evidence that East Coast partially caused the Mountain View Crossing incident. Norfolk will also bear the burden of establishing AG was not prejudiced by late notice. Finally, Norfolk will be required to prove its bad faith claim against AG by showing AG acted in bad faith and that Norfolk incurred additional expense, loss, or damages as a result of AG's bad faith.

**SO ORDERED** this 6th day of October, 2017.